The appellant, Eddie John Campbell, was convicted of capital murder, as defined, by §§ 13A-5-40(a)(2) and 13A-5-40(a)(4),Code of Alabama 1975, and was sentenced to life imprisonment without the possibility of parole.
The evidence as presented by the State tended to establish the following: On December 5, 1987, the Mobile Police Department was notified that a man was down at 1256 Dauphin Island Parkway. Mobile police officers and fire department paramedics responded to this call. Upon arrival, they discovered that a white male, later identified as Johnny Sheffield, was lying in a pool of blood inside a residence at that address. Sheffield was dead, presumably from the numerous stab wounds to his upper back. It also appeared that Sheffield's pockets had been ransacked and that his wallet was missing.
When the officers arrived at the scene, they were approached by the appellant, a black male. The appellant reported that he had seen a black male flee the residence and had been cut by the black male when he attempted to detain him. Appellant had a cut wound on his hand and a cut on his knee. He was subsequently transported to the University of South Alabama Medical Center for treatment.
About this time, Sergeants Billy Luther and Ray McInnis of the Mobile Police Department arrived to conduct a detailed investigation of this homicide. The officers interviewed appellant's mother, Ingrid McMillian, who lived next door at 1254 Dauphin Island Parkway. Ms. McMillian stated that her stepdaughter Delores Campbell and appellant had come home and told her to call the police. They reported to her that someone had broken into Mr. Sheffield's home and that they had gone over, looked inside his house, and had seen him lying on the floor in a pool of blood. Delores *Page 1278 
Campbell told the officers that she was walking to her grandmother's house on Delta Street when she heard her brother, the appellant, calling to her from the corner of Dauphin Island Parkway and Bucker Road. She stated that his hand was bleeding and that she asked him what had happened. He told her that someone had broken into Mr. Sheffield's home and that he had been cut while trying to stop the man from leaving the scene. She asked him numerous times if he had been in Mr. Sheffield's home. Each time he responded, "no." They returned to Sheffield's home, where she climbed up and stood on the air conditioner so that she could look in through the kitchen window. From this vantage point, she saw Sheffield on the floor. She jumped down, and then she and the appellant went next door to their stepmother's and advised her to call the police.
In furtherance of their investigation, Sergeants Luther and McInnis responded to a call on December 6, 1987, where a citizen had found a blood-stained denim jacket by the sidewalk at Dauphin Island Parkway and South Gimon Circle. When they arrived at the scene, the officers observed the jacket and also found a piece of folded notebook paper, which had apparently been written by Mr. Sheffield, bearing the name Eddie John Campbell. They then looked across the street and found a wallet lying on the sidewalk in front of 2000 South Gimon Circle. These items were photographed and secured for evidence. State Constable Don Aucoin and his bloodhound were called to the scene. Aucoin scented the dog on the denim jacket. The dog first led Aucoin and the officers to the victim's house at 1256 Dauphin Island Parkway, then next door to 1254 Dauphin Island Parkway, home of the appellant.
The next day, Sergeants McInnis and Luther went to the district attorney's office and obtained a court order for blood and hair samples to be taken from the appellant. A search warrant was also obtained for the residence of the appellant. Hair and blood samples were taken and then were transported to the Department of Forensic Sciences for examination. A criminal records check was also run on appellant by Officer T.J. Roberts. The check revealed that appellant was wanted in Sacramento, California, for robbery. Appellant was then arrested on a fugitive warrant and was placed in the city jail. No bond was set. After being advised of hisMiranda[1] rights, appellant waived his rights and made statements to the police on December 6, 1987, and again on December 7, 1987. The gist of these statements was that he had helped deliver televisions for the victim and that on the night in question he had observed a black male fleeing from the victim's residence, attempted to detain him, and was injured in the process.
On December 10, 1987, Elaine Scott of the Department of Forensic Sciences advised Sergeants McInnis and Luther that the blood samples removed from inside the bedroom of the victim's home, and also from the denim jacket, had been compared and found to match the blood samples taken from the appellant, Eddie John Campbell. She also advised the officers that this blood type would be common to less than 2% of the population. On December 11, 1987, Captain Richardson, McInnis, and Luther attempted to interview the appellant. Appellant'sMiranda rights were read to him by Captain Richardson and he was informed that his blood matched the blood taken from inside the victim's home. Appellant stated that he did not wish to talk. The interview was then terminated. Law enforcement officials later discovered that the blood obtained from the glass found in the sink of the victim's residence also matched appellant's blood type.
On December 8, 1987, Bruce Smith was interviewed by Sergeants McInnis and Luther. Smith advised the officers that he had worked for the victim at Sheffield TV Service for approximately 4 years. He told the officers that he had seen three $100 bills and several $10 and $20 bills in the victim's wallet on the day he was killed. He told the officers that the victim had paid him $20 and the appellant $10 on the *Page 1279 
day he was killed. He also reported to the officers that the victim should have also had two checks in his wallet in the amounts of $90.71 and $237.10 as payment for services rendered. The officers contacted Ms. Scott at the Department of Forensic Sciences and asked her to open the victim's wallet in their presence. All that was found in the wallet was a check for $237.10.
Appellant's defense was that the black male he said he saw leaving the victim's residence, and whom he said he attempted to detain, had robbed and killed the victim.
 I
Appellant first contends that the prosecution's failure to disclose certain evidence in the State's possession pursuant to the trial court's discovery order prejudiced his defense and denied him a fair and impartial trial.
Discovery in a criminal case is governed primarily by Rule 18 of our Rules of Criminal Procedure (Temporary). Rule 18.1, provides in pertinent part:
 "(c) Documents and Tangible Objects. Upon motion of the defendant the court shall order the district attorney to permit the defendant to analyze, inspect, and copy or photograph books, papers, documents, photographs, tangible objects, controlled substances, buildings or places, or portions of any of these things, which are within the possession, custody, or control of the state and:
 "(1) Which are material to the preparation of his defense; provided, however, the defendant shall not be permitted to discover or inspect reports, memoranda, witness lists, or other internal state documents made by the district attorney or his agents, or by law enforcement agents, in connection with the investigation or prosecution of the case, or statements made by state witnesses or prospective state witnesses;
 "(2) Which are intended for use by the state as evidence at the trial; or
 "(3) Which were obtained from or belongs to the defendant.
 "The court shall impose such conditions or qualifications as may be necessary to protect the chain of custody of evidence, or the attorney's, law enforcement officer's, or investigator's work product, or to prevent loss or destruction of such documents or objects.
 "(d) Reports of Examinations and Tests. Upon motion of the defendant the court shall order the district attorney to permit the defendant to inspect and copy any results or reports of physical or mental examinations or scientific tests or experiments, if the examinations, tests, or experiments were made in connection with the particular case and the results or reports are within the possession, custody, or control of the state, and their existence is known to the district attorney."
Despite these provisions, a defendant has no inherent right to discovery of evidence in the State's possession:
 " '[T]he accused in a criminal case has no inherent right to the inspection or disclosure of evidence in the possession of the prosecution. Whether to grant or deny an accused the right to inspect evidence in the possession of the prosecution lies within the sound discretion of the trial court.' C. Gamble, McElroy's Alabama Evidence, § 290.05(1) (3d ed. 1977). See Killough [v. State, 438 So.2d 311 (Ala.Cr.App. 1982)]."
Curry v. State, 502 So.2d 836, 841 (Ala.Cr.App. 1986). Thus, a reviewing court must generally look to the trial court's discovery order to determine what discovery rights were granted the accused.
However, our examination of the record in this case reveals that, for the reasons addressed below, we need not address the issue of whether the prosecution violated the trial court's discovery order. The evidence which allegedly was not disclosed by the prosecution consisted of expert scientific tests or testimony involving the bloodhound's tracking abilities. Defense counsel objected to the State's attempt to qualify Don Aucoin as an expert in training and handling bloodhounds for tracking purposes, maintaining that any testimony by *Page 1280 
Aucoin was inadmissible since the prosecution had failed to disclose pursuant to the court's discovery order that expert testimony concerning bloodhounds would be used at trial. The prosecution maintained that there was no written documentation concerning the use of the bloodhound to scent the denim jacket and then lead law enforcement officials back to the scene of the crime, and then to the appellant's residence. Moreover, the State maintained, defense counsel was put on notice from the State's "discovery packet" that a bloodhound had been used in the investigation, and since there was no written documentation concerning the tracking, it was up to defense counsel to ask the district attorney for leave to inspect the tangible items of evidence which the State intended to introduce into evidence at trial. After much discussion on this issue, which included the trial judge's expressing his disapproval of the tactics used by the prosecution in such a serious case, the trial court allowed the prosecutor to continue his attempts to qualify Aucoin as an expert in handling and training bloodhounds. Moments later, defense counsel requested that he be allowed to take the witness on voir dire. During voir dire, defense counsel established that the witness had no official certification as an expert in training or handling bloodhounds and that the dog used in this investigation had no official certification other than the fact that she was a thoroughbred bloodhound. Defense counsel also established that the witness had previously been convicted of first-degree theft. At the conclusion of voir dire, defense counsel challenged any further testimony by Aucoin. The trial court granted the motion, but informed the prosecutor that he could attempt to establish the qualifications of the bloodhound itself. Moments later, when it became apparent that this could not be done, the trial court excused Aucoin as a witness.
We disapprove of the tactics used by the prosecution in the instant case, which invite reversal of convictions. However, because the trial court refused to receive into evidence the nondisclosed evidence, albeit for other reasons, no prejudice resulted to appellant's defense. The results of the bloodhound tracking of the scent obtained from the jacket to appellant's residence had already been given to defense counsel in the form of an affidavit attached to the search warrant. This was sufficient to put defense counsel on notice that a bloodhound had been used during the investigation and thus, gave appellant an opportunity to inquire more deeply into the matter. Moreover, defense counsel's statement at trial that he thought that they would deal with the issue concerning the bloodhound in the suppression hearing, but not in the case in chief, indicates that defense counsel was aware that a bloodhound had been used during the investigation of Sheffield's death. Furthermore, the fact that defense counsel was sufficiently prepared to impeach witness Aucoin's credibility by questioning him about a prior felony conviction indicates that he was aware of the existence of such evidence and was well prepared to attack this evidence. Indeed, defense counsel was so well prepared that he kept out of evidence the witness's expected testimony that his bloodhound ultimately led law enforcement officials from the scene where the blood-stained denim jacket was found to appellant's residence. However, assumingarguendo that error occurred by the State's failure to disclose information concerning the bloodhound, the error was harmless. Rule 45, A.R.App.P. Neither was any of the nondisclosed evidence exculpatory and, thus, no Brady[2] analysis is required.
Moreover, the prosecution's attempt to qualify Aucoin as an expert in handling and training bloodhounds does not merit granting appellant's motion for a mistrial. "A motion for mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result.Montgomery v. State, 446 So.2d 697, 702 (Ala.Cr.App. 1983),cert. denied, 469 U.S. 916, 105 S.Ct. 291, 83 L.Ed.2d 227
(1984)." Thompson *Page 1281 v. State, 527 So.2d 777, 779 (Ala.Cr.App. 1988). "A motion for mistrial should not be granted where the prejudicial qualities of the comment can be eradicated by action of the trial court."Henry v. State, 468 So.2d 896, 901 (Ala.Cr.App. 1984), cert.denied, 468 So.2d 902 (Ala. 1985), quoting Nix v. State,370 So.2d 1115, 1117 (Ala.Cr.App.), cert. denied, 370 So.2d 1119
(Ala. 1979).
Here, the witness's limited testimony before the jury consisted of a statement regarding his alleged expert qualifications as a trainer and handler of bloodhounds and a statement that at some point during the investigation of the victim's death a bloodhound had been used. At this point, following lengthy discussions outside the presence of the jury, the trial court refused to accept Aucoin as an expert in his field and excused him as a witness. It was at this point that defense counsel moved for a mistrial. The trial court denied this motion, and nothing more was said concerning this issue. Despite defense counsel's failure to request that the trial court issue curative instructions to the jury to disregard the testimony from Aucoin, we must determine whether the trial court's failure to issue curative instructions ex meru motu
constituted reversible error since a motion for mistrial includes all lesser prayers for relief, including a motion to strike. Ex parte Marek, 556 So.2d 375, 379 (Ala. 1989). Admittedly, the better practice would have been for the trial court to instruct the members of the jury that they were to disregard the limited amount of testimony that they heard from Aucoin. However, we cannot say that the trial court's failure to issue such curative instructions resulted in reversible error. In light of the overwhelming evidence of appellant's guilt and the fact that any testimony concerning how the bloodhound linked appellant to the death of the victim was excluded, we find that the trial court's failure to issue any curative instructions following appellant's motion for mistrial did not injuriously affect the substantial rights of the appellant. Accordingly, no reversal is warranted.
 II
Appellant next contends that the trial court erred in denying his motion for a mistrial after Sergeant Luther mentioned during his testimony that appellant had initially been picked up under a fugitive warrant.
Again, "[a] motion for mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result." Thompson v. State, supra,527 So.2d at 779. See also Kendrick v. State, 444 So.2d 905, 908
(Ala.Cr.App. 1984). Moreover, "[a] motion for mistrial should not be granted where the prejudicial qualities of the comment can be eradicated by action of the trial court." Henry v.State, supra, 468 So.2d at 901. Our examination of the record reveals that the trial court granted a defense motion in limine to prohibit the State from mentioning that the police discovered an outstanding fugitive warrant on appellant. During appellant's trial, Sergeant Luther, in a nonresponsive answer to the prosecutor's question, mentioned that appellant had been handled through the "fugitive detail." After being instructed not to volunteer anything else, the officer inadvertently mentioned "fugitive warrant" in his response to the trial court's instructions. Defense counsel objected and asked for a mistrial, arguing that no curative instruction could "unring this bell that's already been rung." The trial court denied the motion for mistrial and, in accordance with appellant's wishes, gave no curative instructions.
Inadvertent slips during a witness's testimony which are prejudicial to the accused need not be cause for mistrial where the trial court acts promptly to tell the jury that the statement is not to be considered by them. Elmore v. State,414 So.2d 175, 176 (Ala.Cr.App. 1982). See also Richardson v.State, 374 So.2d 433 (Ala.Cr.App. 1979) (witness inadvertently made before the jury a statement that he had been cautioned against making during hearing outside presence of jury and mistrial was denied because judge promptly instructed the jury to disregard). Although curative instructions were not given by the trial *Page 1282 
court in the instant case, they were not given because it was clear to the trial court that appellant did not want such instructions. Under circumstances where curative instructions would have been proper to cure the error and appellant declines the instructions, then the appellant is not entitled to relief on appeal. See Carlisle v. State, 533 So.2d 645 (Ala.Cr.App. 1987) (appellant cannot complain on appeal of trial court's failure to give curative instructions when it was apparent that he did not wish such instructions to be given); Renfroe v.State, 382 So.2d 627 (Ala.Cr.App.) cert. denied, 382 So.2d 632
(Ala. 1980) (appellant's mistrial denied because he felt curative instructions would only draw jury's attention to the prejudicial comment). "A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions." Leverett v. State,462 So.2d 972, 976, 977 (Ala.Cr.App. 1984). Accordingly no reversal is warranted.
Appellant received a fair trial. Therefore, the judgment and sentence of the trial court are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[2] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963).