The appellant was convicted of the murder of Julia Lindsey, the attempted murder of Cathy Wall, and the attempted murder of Barry Kelly. He was sentenced to concurrent terms of life imprisonment for the murder of Julia Lindsey and the attempted murder of Cathy Wall. He was sentenced to 50 years' imprisonment for the attempted murder of Barry Kelly, which sentence was to be served consecutively to the other sentences.
The record indicates the following facts. Tyrone Gibson, one of the appellant's codefendants, testified that McArthur Harris (another codefendant), the appellant, and he met *Page 981 
at the appellant's house to drink beer and whiskey on the night of the offense. Gibson testified that they then got into Gibson's car to go "joy riding," and that the appellant brought his gun with him. Gibson said that they drove to Harris's house to see a gun he had there and, when they left his house, Harris brought the gun. They drove to Gibson's house and got his gun. Thereafter, during the ride, they saw a truck approaching them from behind at a fast rate of speed, and Gibson testified that this angered the appellant. Gibson testified that he slowed down to let the truck pass and as it did the appellant and Harris began shooting at the truck.
The record indicates that Barry Kelly, the driver of the truck, testified that upon approaching Gibson's vehicle, which he testified was traveling at approximately 40 miles per hour, the vehicle slowed down and moved off the road, so that it was barely moving. He testified when he passed the vehicle that he heard a blast, as if a firecracker had been thrown into his truck. He testified that, when he realized he was hearing gunshots, the shots began to come from both sides. He testified that damage was done to the passenger side of his truck, the back of his truck, the tire carrier, the tire in the carrier, and the rear bumper.
Gibson testified that, after this shooting, Harris, the appellant, and he continued drinking and driving down the road in the same direction. He testified that he assumed that they were still on the same road as they had been when they had shot at the truck. He testified that subsequently another car approached them and he became angry because, he said, he wanted to go home, but he did not know where he was. He testified that, while the car was still "a good distance back from us," he laid his gun on the top of his window. He testified that he began trying to time his actions so that, when the car passed him, he would shoot at the vehicle. He stated that he and another passenger in the vehicle shot at the driver's side of the car when it passed. He said he then looked in his rearview mirror and noticed that the car was on the side of the road and that the emergency lights were flashing. He stated that he was preparing to stop his car, when the appellant began "hollering" at him, saying that the police were there and laughing. Gibson testified that he became frightened and sped off.
Kelli Lowe, a 20-year old employee of the State Department of Public Health, testified that after work on the night in question she drove from her home to Montgomery to do some Christmas shopping. She testified that after she left the mall she planned to drive to her boyfriend's house. As she was driving, she noticed the car in front of her slowing down, and she thought that they had possibly missed a turn. She testified that, when she passed the vehicle, she heard a loud noise, but that she kept driving, believing that a tire had gone flat. She stated that she then "felt [her] stomach blow up. [She] felt like [she] was real fat." She then "reached [her] hand [in her] stomach and [her] hand just stuck in." She pulled off of the road to determine what had happened, and she turned on her emergency flashers.
Gibson testified that they next approached a Pontiac Grand Prix automobile, which was ahead of them on the road, traveling in the same direction. He stated that they pulled alongside the car, and observed that the passenger was a female. He testified that they believed that the driver, who was "laid back in his seat," was a male. The appellant then asked the others if they thought that he should shoot this "B," and Gibson responded, "Do what you want to do." Gibson testified that as he began to pass the car, the appellant screamed an obscenity, lifted his gun, and fired into the car. Gibson testified that, when he looked back, he saw the vehicle approaching the back of his car; the car then hit Gibson's car. He testified that the impact scared him and that he sped ahead; however the appellant wanted to stop. The appellant asked the others if they had seen "how the female in the car leaned over in the car when he shot." Gibson testified that the appellant started joking and laughing about how she fell over.
Cathy Wall, who worked at George C. Wallace National Guard Armory and was a member of the Alabama Army National Guard, testified that on the night in question *Page 982 
she and Julia Lindsey, a coemployee and also a member of the Alabama Army National Guard, had stopped by a club to pick up some Christmas ornaments. After getting the ornaments, Julia Lindsey told Cathy Wall that she was going to deliver her ornaments to her mother's house and asked if Cathy would like to ride with her. Wall agreed and they drove to Lindsey's mother's house in Eclectic. Cathy Wall testified that on the ride back to Montgomery she bent over to get a tube of lipstick from her purse and, when she did so, she heard glass shattering. She testified that she felt a bump and, believing that they had been in a wreck, she sat up. She stated that Lindsey then slumped against her and hit her side. The car began swerving off the road and, when Lindsey did not respond to Wall's screams, she pushed Lindsey over and stopped the car. The evidence indicated that Cathy Wall's window had also been blown out by a gunshot.
McArthur Harris testified that, on the night in question, Gibson, the appellant, and he all got their guns, because they planned to go deer hunting in Wetumpka. He testified that they had been drinking and that they continued doing so as they drove. He testified that, when Kelly's truck approached, all three of them began shooting at it. Then Gibson stopped the car, the appellant and Gibson got out of the vehicle, and they continued shooting at the truck. After driving on, they went to see if a friend of Harris's was at his house in Redland. He said that afterwards they were driving home when a car approached them. He testified that the appellant asked Gibson what he was "going to do," and Gibson said, "This is what I am going to do," and shot at the vehicle. Harris testified that he also shot at the vehicle, but that the appellant did not. Harris testified that he did not believe that any of the shots had hit the automobile, but they saw the vehicle's brake lights come on. The appellant said that a police car was coming and told Gibson to drive away. They continued on their way home, when they observed another vehicle traveling in their direction, which they approached. Harris stated that the appellant had rolled his window down, so he also rolled down the window on his side of the vehicle. Harris said that when the appellant rolled his window down, "I had a feeling what he was going to do. And so I rolled down mine." He testified that, before the appellant shot, he told Gibson to "go, go where the car was," meaning "go catch up with the car." Harris testified that he observed someone apparently ducking in the vehicle. Harris stated that the appellant shot his gun, and when he did, the driver's side window of the other vehicle shattered. Harris testified that he shot at the back of the vehicle. The car then swerved and hit Gibson's vehicle. Harris testified that Gibson wanted to stop, but the appellant began laughing, stating that "he know [sic] somebody shot in the head."
 I
The appellant argues that the trial court erred in failing to grant his motion for a change of venue, because, he says, the extensive pretrial publicity had so saturated the community as to have a probable impact on the prospective jurors, and because, he says, the existence of actual prejudice was proven among the jury members.
 " 'A defendant is entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried. Ala. Code, § 15-2-20
(1975); Nelson v. State, 440 So.2d 1130
(Ala.Crim.App.), cert. denied, 440 So.2d 1130 (Ala. 1983); Anderson v. State, 362 So.2d 1296
(Ala.Crim.App. 1978).
 " ' "There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity 'has so saturated the community as to have a probable impact on the prospective jurors' and thus renders the trial setting 'inherently suspect.' McWilliams v. United States, 394 F.2d 41
(U.S.C.A. 8th Cir. 1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a 'pattern of deep and bitter prejudice' must exist in the community. Irvin v. Dowd, [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751
(1961)] supra.
 " ' "The second situation occurs when the defendant shows 'a connection between the *Page 983 
publicity generated by the news articles, radio and television broadcasts in the existence of actual prejudice.' McWilliams v. United States, supra."
" 'Nelson, 440 So.2d at 1131-32.'
 "Thomas v. State, 539 So.2d 375
(Ala.Crim.App. 1988). See also Robinson v. State, 430 So.2d 883 (Ala.Crim.App. 1983)."
Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App. 1988), affirmed, 549 So.2d 135 (Ala. 1989), cert. denied,493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
Thus, a change of venue must be granted only when it can be shown that the pretrial publicity has so "pervasively saturated" the community as to make the "court proceedings nothing more than a 'hollow formality,' " Hart v. State,612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed, 612 So.2d 536
(Ala. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2450,124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723,726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507,16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact "that a case generates even widespread publicity." Thompson v. State, 581 So.2d 1216,1233 (Ala.Cr.App. 1991), cert. denied, ___ U.S. ___,112 S.Ct. 868, 116 L.Ed.2d 774 (1992). " 'Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible.Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].' " Thompsonv. State, supra at 1233, quoting McLaren v. State,353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977). Furthermore, in order for a defendant to show prejudice, the " 'proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299
(Ala.Crim.App. 1978)." Ex parte Grayson, 479 So.2d 76, 80
(Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1985).
The only evidence introduced by the appellant to prove community saturation were newspaper articles. However, a review of these articles, which are contained in the record, indicates that, although many articles appeared in the community newspaper during the commission of the offense, the investigation of the case, and the apprehension of the perpetrators, the articles were predominantly factual summaries of these events. They did not accuse or suppose. Neither were they sensational or denunciatory.
 "Certainly there was widespread media coverage of the events surrounding this case. . . . However, in order to obtain a change of venue, it must be shown that pre-trial publicity surrounding the case was inherently prejudicial. Anderson.
 "After our review of the defense's exhibits relating to this issue and the testimony adduced at the trial on this question, we conclude that the publicity in this case was factual and objective. The bulk of the publicity surrounding this case dealt with the details of the appellant's offense and the developments in his case. The appellant seems to contend that the pre-trial publicity made the community fearful of the appellant, and thus, prejudiced him within the community. While we admit the community was afraid of the appellant before his capture, we believe this was due more to the fact that 'there was a killer on the loose' than to statements by the media concerning the appellant.
 " 'The great majority of the publicity in this case occurred between the time of the murders . . . and the appellant's capture. . . . Thereafter, the publicity in this case greatly diminished. The appellant's trial took place . . . seven months after the bulk of the media coverage in this case. The passage of time cannot be ignored as a factor in bringing objectivity to a case in which there has been extensive pre-trial publicity.' "
Holladay v. State, 549 So.2d at 125-26.
The record indicates that these offenses occurred on December 16, 1991, and that the *Page 984 
appellant was arrested on December 19, 1991. The trial of this case did not begin until May 4, 1992, approximately five months after the offense and the arrest of the appellant. The articles cited by the appellant as prejudicial were circulated at the time of the offense, the initial investigation, and arrests; thus the appellant was brought to trial five months after the publication of the articles he complained of. The language in the articles that the appellant specifically cites as prejudicial are the phrases "rumors of gang violence" and "the City of Montgomery locked in the grip of fear." The appellant also cites language describing the murder victim and relating her Christmas plans. The appellant also refers to articles establishing the reward for information leading to the arrest of the perpetrators and certain language by the Montgomery chief of police, referring to the gunman as a " 'mindless animal that we've got to find.' "
However, a review of all the articles cited by the appellant in their entirety shows that the majority of information was factual and objective. The remarks by the chief of police were published before the appellant's arrest and months before his trial; the police chiefs statements to the press were properly "held to divulge the progress of the investigation."Siebert v. State, 562 So.2d 586, 589 (Ala.Cr.App. 1989). It would be impossible to give an accurate account of this random violence, occurring during Christmas time, without generating public fear. A defendant is clearly not entitled to a change of venue every time his actions cause public fear or apprehension. " 'In reviewing the evidence presented in this cause, we find that the appellant did present evidence of news media and widespread publicity of this matter. However, we find no evidence of an inherently prejudicial climate that would prevent this appellant from receiving a "fair and impartial trial." ' Whisenhant v. State, 555 So.2d 219
(Ala.Cr.App. 1988)." Siebert v. State, 562 So.2d at 590.
As to any actual prejudice shown by the appellant to have resulted from pretrial publicity, the record indicates that there were 31 or 32 people on the jury venire.[1] The veniremembers were asked preliminary questions and then given questionnaires to complete. Thereafter, pursuant to their responses, individuals were brought in for further questioning concerning what they had heard about the case. Thirty-one potential jurors indicated that they had been exposed to pretrial publicity concerning these offenses. Of these veniremembers, all but six indicated that they could base their decisions on the evidence presented at trial, and not be influenced by any pretrial publicity. Six of these potential jurors admitted that they did not believe that they could do so, or that they had preconceived notions of guilt. Of these six, one stated that he had gained his information from members of the police force, where he was employed, and not from any pretrial media coverage. Another of these six stated that she would be unable to put all of the details she learned from pretrial publicity out of her mind, but that her information was gained by listening to the police radio "when everything first started." Each of the six veniremembers who indicated that they would be unable to be impartial and to give the appellant a fair trial was struck for cause.
 " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .' "
Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985) cert. denied,474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), quoting Irvinv. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43,6 L.Ed.2d 751 (1961). "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved." Id., citing Murphy v. Florida, 421 U.S. 794, *Page 985 
799-800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).
 " '. . . "The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Young, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847
(1984).' "
Siebert v. State, 562 So.2d at 589, quoting Fortenberry v.State, 545 So.2d 129 (Ala.Cr.App. 1988) affirmed, 545 So.2d 145
(Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937,109 L.Ed.2d 300 (1990).
The appellant failed to establish either that there was an inherently prejudicial climate that would have prevented the appellant from receiving a fair and impartial trial, or that actual prejudice existed among the jurors at the appellant's trial. "The trial court's findings of impartiality should be overturned only for 'manifest error.' Irvin v. Dowd,366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)."Fortenberry v. State, supra. "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929,931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097,77 L.Ed.2d 1355 (1983)." Ex parte Grayson, 479 So.2d at 80. We find no abuse of discretion by the trial court or manifest error in his finding of impartiality.
 II
The appellant argues that the trial court erred in refusing to dismiss four prospective jurors for cause, based on the allegation that they had been prejudiced by adverse pretrial publicity. However, the record indicates that each of these four jurors stated that despite any preconceived notions or misconceptions he or she would be able to decide the case based solely on the evidence presented at trial.
The first of these jurors indicated that she worked with someone connected with the case and that she had heard about the facts of the case while at work. She stated that her relationship with this individual would not influence her decision and that she did not have a close relationship to this individual outside of her work. She stated that she had heard no one express any opinion concerning the appellant's guilt and that no one to whom she had spoken knew any specifics, other than the fact that the victim's head had been "blown all over the car." She stated that she could ignore any previous information and determine the case based on the evidence, and that her relationship with the individual connected with the case would not influence her decision.
The second of these potential jurors indicated that part of the television coverage that she had seen concerning this case depicted the appellant at arraignment, clothed in a county jail uniform while handcuffed. She stated that she initially noted that he appeared to be foreign and that she "wondered why he was here and if he had a visa to go to school or what." She was then asked if the fact that he was foreign might affect her in any way. The potential juror responded, "No, there [are] a lot of folks here in the United States from other countries." The trial court asked her whether she could put any pretrial publicity out of her mind and render a verdict based solely on the evidence introduced at trial and she responded, "Yes, sir, I think I can." The trial court then asked if she had any reservations or doubts as to this matter, and she stated, "No, I can put it aside."
The third of these potential jurors stated that, if selected to sit as a juror, he could base his verdict solely on the evidence introduced at trial, and disregard any information that he had gotten through the media. This potential juror stated that he was a second year law student and he initially indicated a little reservation in basing his determination solely on the facts. However, when the defense counsel rephrased the question this potential juror stated, "I would have to hear the evidence to make that decision. I can't — I mean, I know what I have heard in the media, but I know to make a decision has to be presented on the evidence. And it would have to be what I hear here or would hear here." The juror indicated that this case was particularly emotional for him because *Page 986 
he had family that travelled on the roads on which the incidents occurred and that, after arrest had been made, he felt some relief. When asked whether he believed the police had gotten the people that had committed the offense off the road, he stated, "possibly." Defense counsel then asked this potential juror what his initial reaction was when he saw the appellant's picture. The juror responded, "I don't recall really having any feelings. I remember if I recall, Mr. Oryang is not American. Is that correct? I remember that part registered with me a little. I thought that that was an unusual situation from a legal point of view."
The last of these potential jurors indicated a difficulty with comprehending the presumption of innocence. Thereafter, the trial court instructed this potential juror on that presumption and, thereafter, denied defense counsel's strike for cause, stating that it had had the opportunity to observe the witness during his responses and it believed that, after the juror had been properly instructed, he would be able to fairly hear the case.
The following transpired during the individual questioning of this potential juror:
 "THE COURT: [potential juror], you have indicated that you have some knowledge about these cases also. Will you tell us what you know about these cases and how you came to that knowledge?
"JUROR: Yes, sir. Just what I read in the paper.
"THE COURT: Newspaper only?
"JUROR: Yes, sir.
 "THE COURT: And do you remember what you read, [potential juror].
 "JUROR: Only I believe there was three of them involved. And they was just riding around shooting. That's about all I remember.
 "THE COURT: If you are selected to sit as a juror in this case, [potential juror], do you think you could put out of your mind what you read in the newspaper and base your verdict only on what you hear in this courtroom and only on what you see in this courtroom?
"JUROR: Yes, sir, I believe so.
"THE COURT: Any question in your mind about that?
"JUROR: No, sir, I don't guess so.
"THE COURT: Okay. Questions by the State?
"[PROSECUTOR]: None, your honor.
"THE COURT: Defense?
 "[DEFENSE COUNSEL]: [potential juror], based on what you read or what you might have heard on the radio or seen on T.V., have you got any opinion one way or the other about this case?
"JUROR: I don't guess so.
"[DEFENSE COUNSEL]: Do you think you might?
 "JUROR: Possibly. What you said earlier where there is smoke there is fire. If he is presumed innocent, what is he doing here? That's my only thing.
 "[DEFENSE COUNSEL]: That bothers you to some extent, does it not?
"JUROR: (Affirmative response.)
 "[DEFENSE COUNSEL]: Apparently you have thought about that since we asked the questions earlier?
"JUROR: Yes, sir.
 "[DEFENSE COUNSEL]: You mentioned earlier that you had read in the paper that there were three people involved in this. Two of the people have already pled which is our theory of the case that only two people were involved in this. Having already read in the paper as you say that there were three people involved, would you have —
 "JUROR: What I mean is three people in the car as I remember in the paper.
 "[DEFENSE COUNSEL]: Having read that, would you have difficulty to believe any evidence that showed that there were only two people in the car? Having read that there were three people in the car, would you have difficulty giving any credibility to evidence that there were in fact two people in the car and not three, despite what the newspaper said?
 "JUROR: Well, if it was brought out that only two, I could believe that, yes. I am only saying what I read in the paper.
". . . . *Page 987 
 "THE COURT: . . . . I need to educate you a little bit, [potential juror], about the presumption of innocence, okay?
"JUROR: Yes, sir.
 "THE COURT: The fact that we are here in this courtroom today doesn't have anything to do with whether or not Mr. Oryang is guilty or not guilty of this charge. Once here, he is presumed not to be guilty of it. That's what the presumption of innocence is. Does that clear it up a little bit for you about 'where there is smoke there is fire'?
"JUROR: Yes, sir."
Thereafter, defense counsel moved that this potential juror be struck for cause, based on his belief that "where there is smoke there is fire." The court responded, "Well, in the context in which the [potential juror] answered the question and in view of my instructions to him, I don't think he really does. And I am going to deny your challenge." Following all of the individual questioning, defense counsel again renewed his motion as to this potential juror, and asked the trial court to reconsider. The trial court stated:
 "Well, you know, it was obvious to me that the [potential juror] was under a misconception about what the presumption of innocence was, which only attaches once there is an indictment and once there is an accusation in the case in the courtroom. I believe that the [potential juror] is now clarified on that. I appreciate your saying that. So I am going to stand on [potential juror] as it was."
The first two potential jurors clearly indicated that they could base their determinations solely on the evidence presented at trial. The third potential juror, the law student, also affirmed that he could base his decision solely on the evidence at trial. The last of the potential jurors expressed a misunderstanding regarding the presumption of innocence. His concerns were not based on preconceived notions caused by pretrial publicity, but rather on a lack of understanding as to when the presumption of innocence attaches. Following the instructions by the trial court, this juror affirmatively stated that he then understood this presumption.
 " 'To disqualify a prospective juror, he must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. Such opinion must be so fixed as that it would bias the verdict a juror would be required to render. Hammil v. State, 90 Ala. 577, 8 So. 380.' McCorvey v. State, 339 So.2d 1053, 1057 (Ala.Cr.App.), cert. denied, 339 So.2d 1058 (Ala. 1976). 'A "fixed opinion" which will bias a verdict is one that is a conviction or prejudgment, a strong or deep impression which closes the mind of a juror and combats the testimony and resists its force.' Nobis v. State, 401 So.2d 191, 197 (Ala.Cr.App.), writ denied, 401 So.2d 204 (Ala. 1981).
 " '[A] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence. See Sparks v. State, 450 So.2d 188 (Ala.Cr.App. 1984); Clark v. State, 443 So.2d 1287 (Ala.Cr.App. 1983); Gwin v. State, 425 So.2d 500 (Ala.Cr.App. 1982); writ quashed, 425 So.2d 510 (Ala. 1983).' "
Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App. 1989), affirmed, 562 So.2d 600 (Ala. 1990), cert. denied, 498 U.S. 963,111 S.Ct. 398, 112 L.Ed.2d 408 (1990).
 " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961). See also Jackson v. State, 516 So.2d 726, 739 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768
(Ala. 1986)."
Carroll v. State, 599 So.2d 1253, 1258 (Ala.Cr.App. 1992), affirmed, 627 So.2d 874 (Ala. 1993).
 "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and evidence. (Citations *Page 988 
omitted.) This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence. See Fordham v. State, 513 So.2d 31, 34-35 (Ala.Crim.App. 1986); Jarrell v. State, 355 So.2d 747-749 (Ala.Crim.App. 1978)."
Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989).
A trial court's decision concerning the qualification of a juror is entitled to great weight on appeal and will not be disturbed unless clearly shown to be an abuse of discretion.Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala. 1990). Under the present facts and especially because the trial court was able to observe firsthand the demeanor of the potential jurors and their answers, there is no indication that the trial court abused its discretion in failing to disqualify these prospective jurors.
 III
The appellant argues that there was insufficient evidence to sustain his conviction of the attempted murder of Cathy Wall, because, he says, there was no evidence that he intended to murder her.
 "Evidence to prove intent need not be direct, but may be circumstantial. Johnson [v. State, 390 So.2d 1160, 1166-67 (Ala.Cr.App.), writ denied, 390 So.2d 1168 (Ala. 1980)]. 'Because the element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.' Johnson, supra, at 1167; Tucker v. State, 383 So.2d 579
(Ala.Cr.App. 1980), writ denied, 383 So.2d 586
(Ala. 1980)."
Benton v. State, 536 So.2d 162, 164 (Ala.Cr.App. 1988).
In Free v. State, 495 So.2d 1147 (Ala.Cr.App. 1986), the defendant was convicted of one count of murder and five counts of attempted murder, arising out of his shooting at people in vehicles from the automobile in which he was riding. The defendant in that case challenged the sufficiency of the evidence to support his convictions for attempted murder because, he argued, the State had failed to prove that he had a specific intent to murder the persons named in the indictments. However, this court found the defendant's argument to be without merit because "[t]he location of the bullet entry points, in most of these incidents, and the fact that one person was killed and another wounded, negates such a contention."
 " 'It is well settled that intent may be presumed from the use of a deadly weapon and the character of the assault. Chaney [v. State, 417 So.2d 625 (Ala.Cr.App. 1982)]. However, this evidence must be sufficient to allow the jury to conclude, by fair inference, that the appellant was shooting at the person (named in the indictment) in particular with the intent to murder him.' "
Free v. State, 495 So.2d 1147, 1158 (Ala.Cr.App. 1986).
In the present case, Harris testified that both he and the appellant fired at the vehicle occupied by Julia Lindsey and Cathy Wall.[2] The record also indicates that a copper bullet casing was found in the driver's seat of Lindsey's vehicle and there was a scratch on the left back quarter panel of the vehicle. The windows on the passenger's side and the driver's side were blown out. Cf. Free v. State, 455 So.2d 137, 148-49
(Ala.Cr.App. 1984). The above-stated evidence, "taken as a whole, would have permitted the jury to reach a 'reasonable factual conclusion that the appellant was shooting at' Cathy Wall with the intent to murder her." Free v. State, 495 So.2d at 1158, citing Coleman v. State, 373 So.2d 1254, 1257
(Ala.Cr.App. 1979), overruled on other grounds, 497 So.2d 519
(Ala. 1986). *Page 989 
 IV
The appellant argues that the trial court abused its discretion by admitting into evidence "gruesome" photographs and thereby deprived him of a fair trial. The appellant refers to photographs depicting the scene of Julia Lindsey's death and of Kelly Lowe's injuries. However, photographs showing external wounds of a deceased victim are admissible even if the evidence is gruesome, cumulative, and relates to undisputed matters.Ex parte Siebert, 555 So.2d 780 (Ala. 1989). Moreover photographs that depict the position and location of a victim's body at the scene of an offense have been held to be proper.Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987). The appellant acknowledges the general evidentiary rule that photographs are admissible even if gruesome and cumulative, as long as they illustrate other testimony in the case; however, the appellant argues that these photographs were highly prejudicial.
However, a review of these photographs indicates that they were properly admitted, although demonstrative of undisputed facts. The admission of photographic evidence is a matter generally left to the discretion of the trial court, and its determination will be reversed on appeal only where an abuse of discretion has occurred. Holden v. State, 584 So.2d 872
(Ala.Cr.App. 1991). In the present case, the trial court's decision to allow these photographs into evidence did not constitute an abuse of discretion.
 V
The appellant argues that the prosecutor's reference to the appellant's opposition to the State's motion to produce deprived him of his right to a fair trial and to due process. However, the record indicates that when the statement to which the appellant refers was made by the prosecutor, the appellant objected. The trial court sustained the appellant's objection and instructed the jury to disregard the prosecutor's statement. Although the appellant made a motion for a mistrial on this ground, it is clear that this error was not so extreme that it could not be eradicated by instructions from the trial court.
 " 'A motion for mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result. Montgomery v. State, 446 So.2d 697, 702
(Ala.Cr.App. 1983), cert. denied, 469 U.S. 916, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984).' Thompson v. State, 527 So.2d 777, 779 (Ala.Cr.App. 1988). 'A motion for mistrial should not be granted where the prejudicial qualities of the comment can be eradicated by action of the trial court.' Henry v. State, 468 So.2d 896, 901 (Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985), quoting Nix v. State, 370 So.2d 1115, 1117 (Ala.Cr.App.), cert. denied, 370 So.2d 1119 (Ala. 1979)."
Campbell v. State, 570 So.2d 1276, 1280-81 (Ala.Cr.App. 1990).
Because the trial court's instructions to the jury to disregard the statement cured any error, the trial court properly denied the appellant's motion for a mistrial.
AFFIRMED.
All judges concur.
[1] The trial court refers to 32 people on the jury venire; however, the appellant argues that there were 31.
[2] Gibson testified that he heard only one shot, which was fired by the appellant, but this conflicting evidence would present a question of fact for the jury.