The appellant, Kendrick McKinney, was indicted on a charge of murder made capital because it was committed during the course of a robbery. § 13A-5-40(a)(2), Code of Alabama 1975. A jury found McKinney guilty as charged in the indictment and recommended that he be sentenced to life in prison without parole. The trial court followed the jury's recommendation and sentenced McKinney to life in prison without parole.
The evidence adduced at trial tended to show the following: On September 26, 1992, at about 11:30 p.m., Birmingham police responded to a call in the Fountain Heights neighborhood, according to testimony from Officer James Lewis. A neighbor sent police to Christopher Hughes's home, where they found a .45 caliber pistol on the porch and keys in the front door, Lewis said. A tote bag holding clothes and papers was found at the bottom of the steps leading to the porch. Lewis testified that police found Hughes's body across the street.
Hughes's mother, Emily Hughes, testified that Hughes had been at her house at about *Page 97 
11:00 on the night of the murder. She said he had just gotten off work and that he wanted her to help him count money he had in a green First Alabama Bank deposit bag. Ms. Hughes said that her son then changed his mind about counting the money that night and put the bank deposit bag into the tote bag he had with him. Ms. Hughes testified that when she went to the murder scene, she saw the tote bag, but she did not see the First Alabama Bank deposit bag.
Juliette Abroms, a neighbor of Hughes's, testified that she saw Hughes come home at about 11:30 on the night of the murder. She said that she saw Hughes get out of his car and that he was carrying groceries. Just as Hughes reached the top step of the porch, Ms. Abroms said, a black male, later identified as McKinney, jumped out from the side of the porch. As Hughes put his key in the door, Ms. Abroms said, McKinney jumped at him. She said she saw McKinney point something at Hughes, and that she then heard a gunshot. She said Hughes jumped off the porch and ran, yelling, "Oh, Lord, help me." Ms. Abroms testified that she heard only one shot, and that she did not hear any conversation or argument between Hughes and McKinney. McKinney ran from Hughes's yard, but Ms. Abroms said that she did not see him take anything from the yard.
Officer Stan McConnell of the Birmingham Police Department testified that he examined Hughes's tote bag at the crime scene. In the bag, he said, was clothing, papers, $532 in bills and $2.96 in coins.
Dr. Bruce Alexander testified that he conducted the autopsy on Hughes and that, in his opinion, Hughes died from a single gunshot wound to the chest.
Albert Herndon testified that he knew the codefendant in this case, John Martin. Herndon said that on the night of September 26, 1992, he saw Martin circle the block on which Herndon lived in Fountain Heights at least three times. Two of those times there was someone in the car with Martin, Herndon said. That person was later identified as McKinney. The third time Martin drove around the block, he stopped the car in front of Herndon's house. Herndon said that he got in the car and smoked some marijuana with Martin, but that no one was in the car with Martin at that time. Herndon said that Martin told him that he was in the neighborhood because "he had one of his boys handling some business." Herndon further testified that Martin appeared jumpy and that he kept looking over his shoulder. Herndon said that as Martin drove away from his house, Herndon heard a gunshot. Herndon said that Martin drove to a corner where McKinney jumped in the car, and then drove away.
Dorothy Dowdell testified for McKinney. She said that she had worked with Hughes for about three or four years and that she had never seen him with a bank deposit bag. She said that he always put his money in the tote bag that was found at the crime scene.
 I
McKinney first argues that the trial court erred by denying his motion for a mistrial made during opening statements when the prosecutor made a remark McKinney argues was a direct comment on his failure to testify. This argument is without merit.
During the prosecutor's opening statement, the following occurred:
 "MS. MONTGOMERY [prosecutor]: You'll learn about him being located or finding him located several houses down from where his house was. He was able to make it there, but that he died on that step. You will also hear at least three times what Mr. McKinney tells you occurred, how he sets up the scenario. And I'll ask you to listen intently, intensely to that, and from this neighbor, Ms. Abroms, as far as what happened on that porch that night. That is the subject of this particular indictment.
 "MR. BRAMER: [defense counsel]: Judge, I'd like to make an objection and approach the bench, please.
"THE COURT: All right."
The following occurred out of the presence of the jury.
 "MR. BRAMER: I made a motion when we had the off-the-record discussion, and I *Page 98 
asked the Judge that I be allowed to put this on the record.
 "My objection would be — during opening remarks it was stated that the jury would hear from Kendrick McKinney at least three times, and my objection is using the terms, 'at least,' means that they could hear more if he chooses to testify. And using the term, 'at least three times,' is a direct reference on Mr. McKinney's testifying or not testifying.
 "MS. MONTGOMERY: In response, Judge, that may be a bleep or a search for something out of those two words, but that comment was strictly from the suppression hearing that we had immediately before these proceedings where there's testimony, and the Court ruled would be admissible in the case, the tape recorded statement, the handwritten statement, and the officer's notations of the statement taken from Mr. McKinney, that being the three, and that was the reference from this prosecutor.
 "MR. BRAMER: And if the prosecutor had said they will hear three times that would be different, but 'at least three' was a direct comment on Mr. McKinney's failure to testify in this trial. We make a motion for a mistrial.
 "THE COURT: All right. I overrule your motion. The Court understood her reference to mean that she had — to the three statements made by the defendant, although I'll be glad to give a curative instruction, which I'll do as soon as they get back out here in that regard."
The trial court then gave the jury a curative instruction over defense counsel's objection.
After carefully reviewing the prosecutor's opening statement, we find that the challenged remark was not a comment on McKinney's failure to testify. The purpose of opening statements is for each party to give the jury an overview of what the evidence will show. As we read the record, the prosecutor was telling the jury what evidence the State would present, including McKinney's side of the story. The State had three pieces of evidence that conveyed McKinney's version — a taped statement, a written statement — and a police officer's notes taken during McKinney's statements, and as we understand the prosecutor's remarks, the jury would be shown each piece of evidence at least once, meaning jurors would hear McKinney's version "at least three times." We do not agree with McKinney that the phrase "at least three times" was a comment on his failure to testify, and we believe this claim is without merit. The trial court did not err in denying his motion for a mistrial as to this issue.
 II
McKinney next contends that the trial court erred by allowing a witness to testify to hearsay. Specifically, McKinney argues, Albert Herndon should not have been able to testify to statements made to him by codefendant John Martin. McKinney claims that Herndon's testimony that Martin told him that he had "one of his boys handling some business" was offered for the truth of the matter asserted and was, therefore, hearsay. He then quotes from several cases regarding the admissibility of coconspirator's statements, but he fails to apply the law to the facts in this case, and the brief leaves unclear exactly what McKinney is arguing.
Coconspirators' statements are admissible as an exception to hearsay, provided certain criteria are met. There must be proof of the conspiracy, and that proof may be wholly circumstantial.Moore v. State, 539 So.2d 416, 420 (Ala.Crim.App. 1988). McKinney does not dispute the existence of a conspiracy, and the evidence presented tended to establish proof of the conspiracy. See, e.g., Moore v. State, 539 So.2d 416. Additionally, a coconspirator's out-of-court statement is admissible when it is part of the res gestae. "Statements made by a co-conspirator within the res gestae of the crime are admissible against the defendant." Moore v. State, 539 So.2d at 420.
Whether a statement falls within the res gestae is best explained by Professor C. Gamble:
 "An act or statement by a co-conspirator is provable against the accused if it is so closely connected and coordinated in time and place with the principal criminal act as that a sound-motion picture of the crime, *Page 99 
which did not show such act or statement, would be reasonably considered as an imperfect portrayal of the crime."
C. Gamble, McElroy's Alabama Evidence, § 195.03(10) (4th ed. 1991). In this case, Martin's statement explained what he and McKinney were doing in the neighborhood and told anyone "watching" events that Martin was waiting for McKinney to finish doing Martin "business." Without the statement, one is left with an "imperfect portrayal of the crime." Therefore, we hold that the statement was within the res gestae and, therefore, was properly admitted by the trial court.
In his brief to this court, McKinney argues as part of this issue that Herndon was induced to testify and that the prosecution violated Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Neither of these issues was presented to the trial court and therefore, neither issue is preserved for this court's review. "[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof. . . . An issue raised for the first time on appeal is not correctly before this court." Buice v. State,574 So.2d 55, 57 (Ala.Crim.App. 1990).
 III
McKinney argues that the trial court erred by not granting his motion for a judgment of acquittal as to capital murder and his motion for a new trial, because, he says, there was no evidence of robbery in this case. McKinney was indicted and convicted of murder made capital because it was committed during the course of a first-degree robbery. § 13A-5-40(a)(2), Code of Alabama 1975.
In deciding a question of the sufficiency of the evidence, this court must accept as true the evidence introduced by the prosecution, must accord the prosecution all legitimate inferences from that evidence, and must consider that evidence in the light most favorable to the prosecution. Morgan v.State, 589 So.2d 1315, 1317 (Ala.Crim.App. 1991); Jackson v.State, 516 So.2d 726, 752 (Ala.Crim.App. 1985).
When viewed in the light most favorable to the State, the evidence tended to show that the victim's mother saw the victim, Hughes, carrying cash in a First Alabama Bank deposit bag shortly before the murder. His mother testified that Hughes placed the bank bag in a larger tote bag Hughes was carrying. One of Hughes's neighbor's testified that she saw Hughes as he arrived home from work on the night of the murder, and, that, as he was trying to unlock his front door, McKinney jumped out from the side of the porch and shot him. She said that she did not see McKinney take anything from the scene. Police did not find a bank deposit bag at the scene, but they did find more than $500 cash in the bottom of the tote bag. We find this evidence was sufficient for the jury to find that McKinney robbed or attempted to rob Hughes. The crime of robbery does not require an actual taking of another's property. Kuenzel v.State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991). The trial court properly submitted the case to the jury, and did not err in denying McKinney's motion for a judgment of acquittal. Further, a reviewing court may not substitute its opinion of the evidence in place of the jury's by attempting to determine the weight and probative force of the evidence. Deutcsh v. State, 610 So.2d 1212, 1234
(Ala.Crim.App. 1992). Therefore, we hold that the trial court did not err by denying appellant's motion for a new trial based on insufficiency of the evidence.
McKinney further argues that there was conflicting testimony as to whether Hughes actually used a bank deposit bag to carry money home from work. We do not disagree. However, " '[c]onflicting evidence presents a jury question not subject to review on appeal, provided the State's evidence establishes a prima facie case.' " Sankey v. State, 568 So.2d 366, 369
(Ala.Crim.App. 1990) (quoting Jackson v. State, 516 So.2d 726
(Ala.Crim.App. 1985)). Further, a conviction will not be set aside on the grounds of insufficient evidence unless the preponderance of the evidence against the verdict is so decided as to clearly convince this court that the verdict *Page 100 
was wrong and unjust. Sankey, 568 So.2d at 369 (quoting Jacksonv. State, 516 So.2d 726 (Ala.Crim.App. 1985)). After reviewing the record in this case, we find the evidence was sufficient to support the jury's verdict of guilty of capital murder.
 IV
McKinney also claims the trial court erred by not giving his written requested jury charge on self-defense. The trial court charged the jury on self-defense as follows:
 "Now, the issue of self-defense has been raised in this case. Keep in mind that the burden is not on the defendant to prove self-defense, but the State has the burden of proving beyond a reasonable doubt that the defendant's act was not justified by self-defense. The law makes a — the law of self-defense makes a distinction between what force you — when you can legally use physical force and when you can use deadly physical force.
 "In other words, the law says that a person is justified in using physical force, not deadly physical force upon another person in order to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person. And he may use a degree of force which he reasonably believes to be necessary for that purpose.
 "However, the law says a person can only use deadly physical force — and that's defined as follows: It's force which is, under the circumstances of which it is used, readily capable of causing death or serious physical injury. A person may only use deadly physical force if he reasonably believes that the other person is using or about to use unlawful deadly physical force towards him.
 "The law says that a person is not justified in using deadly physical force upon another person if it reasonably appears or he knows that he can avoid the necessity of using such force with complete safety by retreating.
 "The law also says that a person is not justified in using deadly physical force of physical force if he was the initial aggressor or brought on this difficulty himself."
McKinney argued that the last sentence was not a complete statement of the law, and he wanted the trial court to give his requested charge, which reads as follows:
 "While it is not required that where a person is menaced he must wait until a weapon is presented ready for deadly execution, yet the danger must be real or so manifestly apparent as to create a reasonable belief of presently impending peril to life or limb; in determining this question, evidence most favorable to the defendant should be considered." Lemley v. State, 599 So.2d 64
(Ala.Crim.App. 1992).
The trial court's jury charge on self-defense was thorough and substantially covered McKinney's requested jury charge. "The refusal of a requested written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge or in other charges given at the request of the parties." Rule 21.1, Ala.R.Cr.P. In its charge to the jury, the trial court gave substantially the same rule of law as stated in the appellant's requested charge; therefore, the trial court did not err in refusing the charge.
 V
McKinney maintains that the trial court erred by not striking a certain juror for cause. Specifically, McKinney argues, the trial court should have granted his challenge for cause as to prospective juror S. because S. knew the victim's family and initially said she would rather not sit on the jury for McKinney's trial.
That a prospective juror knows the victim's family is not a statutory ground for excluding that juror. § 12-16-650, Code of Alabama 1975. " 'To justify a challenge of a juror for cause, there must be a statutory ground, or some matter which importsabsolute bias or favor, and leaves nothing to the discretion ofthe trial court.' " Barnett v. State, 639 So.2d 527
(Ala.Crim.App. 1993) (quoting Nettles v. State, 435 So.2d 146
(Ala.Crim.App. 1983), aff'd, 435 So.2d 151 (Ala. 1983)) (emphasis in the original) (citations omitted). *Page 101 
 " '[A] proper challenge for cause exists only when a prospective juror's opinion is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence.' "
Siebert v. State, 562 So.2d 586, 595 (Ala.Crim.App. 1989) (quoting Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala. 1988). See, also, § 12-16-150(7), Code of Alabama 1975.
Our review of the record shows that when the trial court individually questioned the challenged juror, the juror said she could be objective and that knowing the Hughes family would not affect her decision in this case. McKinney failed to establish that the juror had an opinion so fixed that she could not ignore it, nor did he establish that the juror was unable to try this case fairly and impartially. Therefore, the trial court did not err in denying his challenge for cause as to the potential juror.
 VI
McKinney argues the trial court erred by not granting a mistrial when the prosecutor tried to get into evidence the results of a lineup that had been suppressed during a suppression hearing.
"A motion for mistrial implies a miscarriage of justice and is such a serious matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result." Campbell v. State, 570 So.2d 1276, 1281
(Ala.Crim.App. 1990).
During the trial of this case, the prosecutor asked a police officer involved in the case the following:
 "Q. [prosecutor]: Did you indicate to Mr. McKinney the results of the lineup that he was in?
 "MR. BRAMER [defense counsel]: Your Honor, I object to the mention of lineup. It's been excluded, and I move for a mistrial.
 "THE COURT: Well, I sustain the objection. I overrule your motion."
McKinney argues that the prosecutor bolstered her witness's testimony by commenting on something not in evidence, conveying to the jury that there was evidence not presented to it that would support the charge against the defendant. Therefore, McKinney says, the prosecutor's question prejudiced his right to be tried on the evidence presented to the jury.
Because the trial court sustained McKinney's objection regarding mention of the lineup, the results of that lineup were never presented to the jury. The question posed by the prosecutor was not a fundamental error that led to a miscarriage of justice. The trial court was correct in denying McKinney's motion for a mistrial.
 VII
McKinney argues that the trial court erred by admitting a .38 special Colt revolver into evidence when, he says, there were missing links in the chain of custody. At trial McKinney objected on the grounds that the State had not presented any evidence regarding the custody and condition of the revolver before a police officer took possession of it. In his brief to this court, however, McKinney argues that the State failed to show who took possession of the gun at the Alabama Department of Forensic Sciences and failed to show what the examiner from the forensic lab did with the revolver when he finished testing it.
"The statement of specific grounds of objection waives all grounds not specified and the trial court will not be put in error on grounds not assigned at trial." Jackson v. State,593 So.2d 167, 171 (Ala.Crim.App. 1991). Further, "A defendant is bound by the grounds of objection he stated at trial and may not expand those grounds on appeal." Cole v. State,548 So.2d 1093 (Ala.Crim.App. 1989). "[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof. . . . An issue raised for the first time on appeal is not correctly before this court." Buice v. State,574 So.2d 55, 57 (Ala.Crim.App. 1990).
Because McKinney now argues an issue not presented to the trial court, that issue *Page 102 
cannot be considered by this court. The judgment is due to be affirmed.
AFFIRMED.
All the Judges concur.