Rel: June 27, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

————————————————

## CR-2023-0752

————————————————

### Anthony Orr

### v.

### State of Alabama

### Appeal from Mobile Circuit Court
### (CC-20-2604)

COLE, Judge.

Anthony Orr appeals his convictions for intentional murder, a violation of § 13A-6-2(a)(1), Ala. Code 1975, attempted murder, a violation of §§ 13A-4-2 and 13A-6-2, Ala. Code 1975, attempted first-

degree assault,[1] a violation of §§ 13A-4-2 and 13A-6-20, Ala. Code 1975, and discharging a firearm into an occupied vehicle, a violation of § 13A-11-61, Ala. Code 1975, and his resulting concurrent sentences under the Habitual Felony Offender Act of life imprisonment for his intentional-murder conviction and attempted-murder conviction; 15 years' imprisonment for his attempted-first-degree-assault conviction; and 10 years' imprisonment for his discharging-a-firearm-into-an-occupied-vehicle conviction.

Facts and Procedural History

Valerie Reed ("Reed") and Orr were married in 2013, but they divorced on September 26, 2019. Throughout Reed and Orr's marriage, there were allegations of domestic abuse. On February 22, 2020, despite Reed's having a protection-from-abuse order against Orr, while Reed and Orr were both attending the Dragon Ball, Reed's cellular telephone was taken from her by Orr. Orr subsequently chased and choked Reed at the Dragon Ball. Reed reported the incident to law-enforcement officers, and

---

[1]Orr was originally indicted for attempted murder but was convicted of the lesser-included offense of attempted first-degree assault. (C. 12; R. 915.)

her phone was subsequently recovered from Orr by law-enforcement officers. Thereafter, Reed, along with her daughter, Malerie Reed ("Malerie"), overheard a telephone conversation between Orr and Eldred Martin Hall ("Hall") in which Orr threatened "to kill" Reed and Hall. (R. 371-72.)

On February 24, 2020, Reed, Hall, Malerie, Angela Thompson ("Thompson"), and Reed's nieces, among others, participated in a downtown parade that began at 2:00 p.m. According to Reed, while on the parade route, Orr, upon seeing Reed's float, "jumped the barricade" and proceeded to run "behind the float" for approximately "half of a mile." (R. 375.) While Orr followed the float, Orr threatened to "kill" Hall and Reed. Hall, according to Reed, told Orr he was not scared of him and that Orr would only fight a woman. Orr eventually stopped chasing the float. Thompson also testified that Reed came up to her while on the float and told her "that [Orr] tried to pull her off the float." (R. 341-42.)

After the parade was over, Reed and Thompson "unpack[ed] the float" while in the back of their U-Haul truck, while Hall loaded a generator into the back of his pickup truck. (R. 377-78.) Reed then heard Orr say, "I told you 'I was going to kill you,'" and she saw Orr with a gun

and "fire [was] coming from the gun." (R. 380-81.) Orr shot at Hall while Hall's "back was turned," and Reed saw Hall fall to the ground. Thereafter, Reed observed Orr standing over Hall, who was on the ground, and firing "one or two [more] times" before Orr "turned the gun towards [Reed,] … said, 'hey Valerie,' and when [Reed] looked, [Orr] said 'I told you I was gonna get you M. Fuckers'" and fired multiple rounds into the back of the U-Haul truck. (R. 381.) As Orr shot into the U-Haul truck, Reed was standing, but Thompson pulled her down to the floor and told Reed to "play dead." While lying on the floor of the U-Haul truck, Thompson called 911 with her cellular telephone.

Thompson testified that, while she was in the back of the U-Haul truck, she saw Orr "out of the corner of her eye." (R. 344.) Thompson saw that Orr had a gun pointed at Hall and heard Orr say, "'motherfucker, I told you.'" (R. 345.) Orr then fired his gun, and Hall fell to the ground. Once Hall fell, "Orr turned around in [Thompson's and Reed's] direction and … started firing." (R. 346.) Thompson agreed that she pulled Reed to the floor, told Reed to play dead, and called 911 using her cellular telephone. According to Malerie, as the U-Haul truck was being loaded, "Orr walked up and … said, … 'I told you I was gonna get

4

you, motherfucker.'" (R. 313.) Hall, who had his back to Orr, turned around as Orr began shooting. Malerie saw Hall fall to the ground before fleeing and hiding underneath a nearby vehicle and called 911.

Officer Daniel Hill, with the Mobile Police Department, who was working parade detail, heard the gunshots and proceeded to the area. Officer Hill arrived in the area "[l]ess than a minute" after the gunshots were fired and observed Hall lying on the ground with multiple gunshot wounds. (R. 227.) Officer Araka Young, with the Mobile Police Department, also heard the gunshots and arrived in the area "[l]ess than a minute" after the gunshots were fired. She observed Hall on the ground, Malerie in front of the U-Haul truck and Thompson and Reed in the back of the U-Haul truck. Officer Arthur Byrd, with the Mobile Police Department, was also working parade detail when he heard the gunshots and proceeded to the area. Officer Byrd arrived in the area "[a] minute and a half, two minutes tops" after the gunshots and found "a semi-automatic handgun l[]ying near" Hall. (R. 244-45.) Officer Ian Rebhorn, with the Mobile Police Department, was assigned to the crime-scene unit and arrived on scene around 6:30 p.m. Officer Rebhorn located "13 Sig .40 caliber Smith & Wesson casings, one RP 25 auto casing, four jacket

5

fragments, one damaged bullet, and two led fragments" on the scene. (R. 271-74, 277, 282.)

Neither Thompson nor Malerie were injured. However, Reed was shot "[o]ne time … in [her] spine, and the bullet is still … lodged in [her] back." (R. 383.) She was also "grazed" by another projectile. Due to Reed's back injury, she will never be able to walk again. Dr. Jonathan Newsome, senior medical examiner for the Alabama Department of Forensic Sciences ("ADFS"), testified that he performed the autopsy on Hall. Hall's body had "five separate gunshot wounds, and … also shrapnel wounds." (R. 421.) Hall was shot in the back and front of his body. Dr. Newsom opined that the cause of Hall's death was "multiple gunshot wounds." (R. 434.)

Patricia Lindley, a firearm and toolmarks specialist with ADFS, performed "a firearm analysis, a bullet analysis, [and] a cartridge case analysis." (R. 456.) Through testing, Lindley determined that the "Beretta pistol, caliber .25" was responsible for the one fired .25 caliber cartridge casing found on the scene. (R. 456-57.) Lindley was also able to determine that the "13 fired .40 caliber cartridge cases" were "all … fired from the same firearm." (R. 461.)

Detective Julius Nettles, with the Mobile Police Department, was the lead detective and interrogated Orr. During Orr's interrogation with Detective Nettles, Orr stated that he last interacted with Reed "at the Dragon Ball … at the Gulf Shores Fairgrounds" on February 22, 2020. (R. 486-87.) Orr admitted that he chased Reed's float on February 24, 2020, but that he did so only because Reed "didn't see him at first." (R. 491.) Orr denied that he wore any rain gear on February 24, 2020, but surveillance video from Gulf City Lodge, taken "20 or 30 minutes prior" to the shooting, showed Orr "wearing [a] fluorescent, yellow rain suit and … latex gloves." (R. 492, 495, 540-41.) The Gulf City Lodge surveillance video also showed a "pistol that appeared to come from [Orr's] waistband or certainly from [his] person" fall to the ground and Orr subsequently "recover[ing] the gun and then walk[ing] out of the Gulf City Lodge." (R. 542.) During the police interrogation, Orr denied on multiple occasions that he shot Hall, or anyone else, and referred to Reed as his wife. Orr also denied ever being at the Gulf City Lodge, and he did not claim that he acted in self-defense.

In his defense, Orr called Lewis Hawkins IV ("Hawkins"), Juan Bowling ("Bowling"), and James Orr ("James") to testify. Hawkins, Orr's

7

first cousin, did not witness the shooting. However, Hawkins saw both Orr and Reed together in the weeks leading up to February 24, 2020. Bowling, who was a family friend, was on the parade float with Reed and the others on February 24, 2020. Bowling also observed Orr and Reed together the week before February 24, 2020. While on the parade route, Bowling heard Hall "doing a lot of cursing" and "pointing at Mr. Orr." (R. 626, 628.) Bowling did not see Orr chasing the float, but he did see Orr "in the street." (R. 629-30.) Bowling did not see the shooting, but he heard the gunshots and returned to the area. Bowling heard "a smaller caliber weapon" first and then subsequent louder shots. (R. 633.) Once at the scene, Bowling saw "Hall lying on the ground and … as [he] was about to attempt to check for a pulse … the police came out and … drew [their] guns" on him. (R. 631-32.) James, Orr's brother, was not present for the shooting. James testified that he observed Orr and Reed together the week before the parade. James was also on the parade float with Reed and the others and saw Hall "going off" on Orr, and James said that Hall appeared to "reach[] for a pistol." (R. 660.) After the parade, James heard the gunshots; he stated that he "heard a small caliber, and then … heard a larger caliber" gunshot. (R. 668.)

8

Orr also testified on his own behalf. He admitted that he shot Hall, but he stated that he "didn't know [he] shot [Hall]" at the time. (R. 693.) However, Orr also testified that he shot Hall in self-defense. In the week before the parade, Orr spent time with Reed. He admitted that he took Reed's cellular telephone at the Dragon Ball. Orr alleged that Hall, over a telephone call, cursed him and threatened to kill him and his mother. Orr admitted that he went to the Gulf City Lodge on February 24, 2020, and admitted that he was involved in the shooting, despite his denials during his interrogation. Orr admitted he chased after the float when it passed but denied threatening anyone. While he was chasing the float, Orr stated, Hall "kept … cursing at" him, "shot the bird at him[,]" and "tried to … go in his pants," but Reed "grabbed [Hall]." (R. 718-19.) Orr admitted that on February 24, 2020, he wore rain gear. Orr also admitted going to the shooting scene with a gun that day, but he testified that Hall fired his gun first and that he only returned fire while fleeing.

The jury convicted Orr for the intentional murder of Hall, the attempted murder of Reed, the attempted first-degree assault of Thompson, and discharging a firearm into an occupied vehicle. Orr was subsequently sentenced to concurrent sentences of life imprisonment for

9

his convictions for intentional murder and attempted murder; 15 years' imprisonment for his conviction for attempted first-degree assault; and 10 years' imprisonment for discharging a firearm into an occupied vehicle. This appeal follows.

<u>Discussion</u>

On appeal, Orr raises three arguments: (1) whether the trial court erred in striking for cause seven prospective jurors, (2) whether the trial court erred in denying his motion for a mistrial based on an allegedly improper argument the State made in its rebuttal closing argument, and (3) whether the trial court erred in denying his motion for a new trial based on the same allegedly improper argument made by the State in its rebuttal closing argument. None of these issues entitle Orr to relief.

I.     <u>Jury Strikes</u>

Orr argues that the trial court erred in striking for cause seven prospective jurors without any evidence supporting a legal basis to do so. Specifically, Orr argues that the trial court erred "in striking A.S. (panel number 2), K.B. (number 9), T.H. (number 21), J.L. (number 24), G.M. (number 27), P.P. (number 29), and D.S. (number 34) for cause, based on a bare allegation by the State that [each] had prior arrests/convictions

that [each] failed to disclose in voir dire, without any evidence that the

veniremembers had actually been arrested/convicted of a crime." (Orr's

brief, p. 14.) The State argues that Orr failed to preserve his argument

for appellate review.

Following voir dire, the following occurred:

"[THE STATE]: Then the second category of strikes for cause, Judge, we are able to pull up NCIC for various witnesses. Looked at their arrest and conviction records, and I asked every person have you ever been accused, arrested, or convicted, and have a list here of witnesses who failed to disclose that information.

"THE COURT: You keep saying witnesses.

"....

"[THE STATE]: We don't have any witnesses. The list [of] jurors who failed to disclose that information.

"THE COURT: Potential jurors.

"[DEFENSE COUNSEL]: Your Honor, and I always object to this. This is NCIC -- we -- defense attorneys cannot have access to, do not have access to. And they're in realtime going back and looking at them. And, you know, I mean, unless they give us access to this, I mean, I think we don't --

"THE COURT: I don't think they can give you access to it. I mean, they can tell you what they have found and we can explore it as to each and every potential venire person.

"[DEFENSE COUNSEL]: Okay.

11

"THE COURT: But the question was asked whether or not anyone had any convictions and no one answered affirmatively that I recall.

"[THE STATE]: The only one that did said that she had a car tag. And that's actually one of the witnesses we found that she was -- sorry, jurors. Goodness gracious. Jurors. That's one of the jurors that we saw had a battery, domestic violence, a great number of things.

"THE COURT: And that was number --

"[THE STATE]: 33. You already struck her.

"THE COURT: Right.

"[THE STATE]: The ones that the State have were No. 9, 24, 27, 29.

"[DEFENSE COUNSEL]: Wait, wait, wait. You said 9, 24, and 27?

"[THE STATE]: 29, 21 -- I'm sorry, I went out of order. 33, we already did her, and 34. Oh. And No. 2.

"I know [defense counsel] probably wants him struck. Some of these witnesses -- or jurors I would like. Some of these jurors I would not like, but the State has a duty to be honest about this, so if there's someone who didn't report honestly that I would want to keep, I still have to report that as well.

"....

"THE COURT: All right. You have any questions, [defense counsel]?

"[DEFENSE COUNSEL]: We're getting down to -- for a murder case down to 26 jurors. 26.

12

"THE COURT:  You have to have 24.

"[THE STATE]:  In order to qualify, you need 24.

"….

"[DEFENSE COUNSEL]:  And what do they have?  I mean, that --

"[THE STATE]:  So No. 2 that failed to disclose an arrest for theft.  No. 9 an arrest for theft, fraudulent use, and receiving.  Number -- who's next?

"[DEFENSE COUNSEL]:  Which one was that?

"THE COURT:  21.

"[THE STATE]:  No. that was No. 9 that I just said.  21, negotiating worthless instrument.  24, DUI.  27, more multiple DUIs and BUIs.  29, criminal trespass.  33 a litany of DVs including DV first.

"THE COURT:  33 is already gone.

"[DEFENSE COUNSEL]:  Yeah.

"[THE STATE]:  Yeah.  34 MIB and DUI.

"THE COURT:  All right.  I'm going to grant all of those.  So that removes 9, 24, 27, 29, 21, 34, and 2.

"[THE STATE]:  Yes, Judge.

"[DEFENSE COUNSEL]:  I'm going to have to get back.

"….

13

"[DEFENSE COUNSEL]:  I'm sorry, Judge.  In a case of this magnitude where my client is facing -- if convicted, life or life without --

"THE COURT:  Right.

"[DEFENSE COUNSEL]:  I mean, I think we're getting very close to --

"THE COURT:  I think we're well within the limits with 26.  I think we're good.

"[DEFENSE COUNSEL]:  Yes, ma'am.

"THE COURT:  Okay.

"[DEFENSE COUNSEL]:  If you'll just note my objection.

"THE COURT:  So noted. ..."

(R. 184-88.)  Based on this exchange, Orr made two objections to the State's motions to strike for cause certain veniremembers: (1) Orr objected to not being able to have access to data provided by the National Crime Information Center ("NCIC"[2]) and (2) he indicated that the

---

[2]This Court has found that NCIC records are not discoverable, but a defendant would have the right to question potential jurors regarding the extent of their prior criminal record during voir dire, which would remove any prejudice from a defendant's not having access to NCIC records.  See Doster v. State, 72 So. 3d 50, 79-80 (Ala. Crim. App. 2010).  Here, the trial court gave Orr the opportunity to ask additional questions of the potential jurors based on the State's proffer of the NCIC records.  Orr, however, did not request or engage in further questioning.

14

amount of veniremembers remaining to strike his jury from might not be sufficient. Orr does not advance either of these arguments on appeal, and arguments not contained in an appellant's brief are deemed abandoned and will not be considered on appeal. Bryant v. State, 181 So. 3d 1087, 1121 (Ala. Crim. App. 2011).

Orr, on appeal, argues that the trial court erred in striking the veniremembers without a legal basis to do so. However, as this Court has stated:

> "'Review on appeal is restricted to questions and issues properly and timely raised at trial.' Newsome v. State, 570 So. 2d 703, 717 (Ala. Crim. App. 1989). 'An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented.' Pate v. State, 601 So. 2d 210, 213 (Ala. Crim. App. 1992). '"[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.' McKinney v. State, 654 So. 2d 95, 99 (Ala. Crim. App. 1995) (citation omitted). 'The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.' Ex parte Frith, 526 So. 2d 880, 882 (Ala. 1987). 'The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.' Ex parte Works, 640 So. 2d 1056, 1058 (Ala. 1994)."

Ex parte Coulliette, 857 So. 2d 793, 794-95 (Ala. 2003). Because Orr did not advance his trial-court argument that there was no legal basis for that court to strike for cause the complained-of veniremembers, Orr failed to preserve his specific argument for appellate review. Orr is, thus, due no relief.

## II.    Improper Argument

Orr also argues on appeal that "the State made an argument in its rebuttal closing argument that infected Mr. Orr's trial with unfairness to the point where he was denied a fair trial, consistent with due process, and the trial court did nothing to cure the improper argument." (Orr's brief, p. 22.) Specifically, Orr argues that the trial court abused its discretion by denying Orr's motion for a mistrial.[3] The State argues that Orr failed to preserve this issue for appellate review.

Orr, although claiming self-defense at trial, never mentioned self-defense to law-enforcement officers during his interview. Orr explained the inconsistencies in his story by alleging, among other things, that he

---

[3]We have combined Orr's arguments as to the alleged improper argument of the State and the denial of Orr's motion for a new trial because these claims are intertwined.

was intoxicated when he made his original statement to law-enforcement officers. In the State's rebuttal closing argument, the following occurred:

> "Members of the jury, these officers gave him chance after chance after chance. Come on, Anthony. We know there was some reason for this. Come on, Anthony. Did he do something to provoke you? Come on, Anthony. Over and over again. Gave him a chance tell the truth. But he wants you to think that he was so drunk that he couldn't come up with the correct story. Instead, he lied.
>
> "Members of the jury, I spent a lot of time around drunk people, and the one thing that I know is that the more they drink, the[] looser their lips get but not tighter.
>
> "If you want to think for one second that this man was drunk as a skunk and that that gave him the instinct to lie about each and every single detail of this case?
>
> "Members of the jury, I know you weren't born yesterday, and I know that doesn't make a lick of sense. Instead what makes sense is that he met with his lawyer and said, okay. I know I said in the interview that I was drunk. Do you think that's a good reason for me to say I didn't do all those things?"

(R. 843-44.) Orr objected to the State's argument insinuating that defense counsel "came up with a story" for Orr to tell the jury. (R. 844.) The trial court "[o]verruled" Orr's objection and told the State to "[m]ove on." (R. 844.) After the State finished its rebuttal closing argument, Orr moved for a mistrial arguing that the State had made improper arguments in its closing argument insinuating that defense counsel

17

"came up with a lie for [Orr] to tell" the jury. (R. 858.) The trial court denied Orr's motion for a mistrial.

Subsequently, on October 10, 2023, Orr timely moved for a new trial, alleging that the State made an improper argument insinuating that Orr's "counsel 'concocted' the [trial] testimony of" Orr, which, he said, was a "personal attack[]" on Orr's counsel "without any supporting admissible evidence presented at trial." (C. 148-50.) Orr argued in his motion for a new trial that, given the State's improper argument, he was due a new trial. The trial court held a timely hearing on Orr's motion for a new trial and denied the motion.

Orr failed to preserve this issue for appellate review.

> "To be timely, a motion for a mistrial must be made 'immediately after the question or questions are asked that are the grounds made the basis of the motion for the mistrial.' Ex parte Marek, 556 So. 2d 375, 379 (Ala. 1989). The motion is untimely if it is not made until the conclusion of the witness's testimony or counsel's argument. Menefee v. State, 592 So. 2d 642, 647 (Ala. Crim. App. 1991); Robinson v. State, 584 So. 2d 533, 538-39 (Ala. Crim. App.), cert. quashed, 584 So. 2d 542 (Ala. 1991)."

Wilson v. State, 651 So. 2d 1119, 1122 (Ala. Crim. App. 1994); see also Jones v. State, 895 So. 2d 376, 379 (Ala. Crim. App. 2004) (finding a motion for a mistrial untimely, even though the defendant objected to the

18

improper questions and comments, because the motion for a mistrial was not made "until after closing arguments" were completed); Cooper v. State, 912 So. 2d 1150, 1159 (Ala. Crim. App. 2005) (same).[4] Likewise, Orr's motion for a new trial did not preserve his mistrial argument for appellate review.

> "'"Although courts have sometimes departed from this rule, generally, in analogy to the rule limiting the scope of review on appeal to questions raised below, a new trial will not be granted for matters pertaining to rulings, evidence, or occurrences at a trial, including erroneous conduct on the part of the court, counsel, or jury, unless timely and sufficient objections, requests, motions or exceptions have been made and taken. Any grounds which might have been afforded by such matters are presumed to have been waived, except where such matters were unknown to applicant until after verdict and could not have been discovered by the exercise of reasonable diligence, and except in instances of fundamental errors which of themselves invalidate the trial. [Citations omitted]."'
>
> "Woodward v. State, 480 So. 2d 69, 73 (Ala. Crim. App. 1985) (quoting Leverett v. State, 462 So. 2d 972, 979 (Ala. Crim. App. 1984)). Furthermore, '[t]he grounds urged on a motion

---

[4]We recognize that Orr argues that he preserved this issue for appellate review by timely objecting to the State's allegedly improper argument and then supplementing his objection with his motion for a mistrial after the conclusion of the State's rebuttal closing argument. (Orr's reply brief, pp. 3-9.) However, we have previously rejected this same argument in Jones, supra, and Cooper, supra.

for a new trial must ordinarily be preserved at trial by timely and specific objections.' Trawick v. State, 431 So. 2d 574, 578-79 (Ala. Crim. App. 1983)."

Craft v. State, 90 So. 3d 197, 218-19 (Ala. Crim. App. 2011). To the extent that Orr's motion for a new trial sought to support his motion for a mistrial, Orr's argument is not preserved. However, Orr did timely object and receive an adverse ruling to the State's alleged improper argument in its rebuttal closing argument.

This Court has recognized that, "[i]n order for a prosecutor's comments made during argument before the jury to require a new trial, the entire trial must have been so infected with unfairness as a result of these comments that the [defendant] was denied due process." Hart v. State, 612 So. 2d 520, 527 (Ala. Crim. App. 1992) (citing Darden v. Wainwright, 477 U.S. 168, 181 (1986)); Shanklin v. State, 187 So. 3d 734, 787 (Ala. Crim. App. 2014) (same). After review of the complained-of argument, along with the entire closing arguments and the trial itself, we do not find that Orr was "denied due process" from the prosecutor's comment. While the comment may have been ill-advised, it was not so detrimental in this case as to find that Orr's "entire trial" was "infected

20

with unfairness" due to the prosecutor's comment, which would result in a denial of due process.

In Crook v. State, 276 Ala. 268, 270, 160 So. 2d 896, 897 (1962), the Alabama Supreme Court found that "[o]ne of the most prevalent arguments to a jury is that the position and argument of the adversary is unwarranted, silly, fanciful or illogical." See also Minor v. State, 914 So. 2d 372, 423-24 (Ala. Crim. App. 2004) (same). The State was arguing that Orr's trial testimony was unbelievable because Orr had blamed his continual lies to law-enforcement officers on his being drunk. That testimony, according to the State, was simply "unwarranted, silly, fanciful or illogical." In speculating that Orr must have suggested to his defense counsel that his drunkenness was a good reason for his initial lies, the State was only pointing out the absurdity of Orr's claim -- that being drunk was a valid excuse for Orr's lies to law-enforcement officers on the day of the shooting. It does not appear that the State was alleging that Orr's counsel was lying or instructed Orr to lie but that Orr's excuse for lying was simply not believable. Given that the State's complained-of argument was limited to that instance and was not repeated, we do not find that Orr was denied due process. See Breland v. Ford, 693 So. 2d

393, 398 (Ala. 1996) (quoting Yesterday's, Inc. v. Lamey, 492 So. 2d 988, 989 (Ala. 1986)) ("It is well established that 'control of the argument of counsel is largely within the discretion of the trial judge, who observes the demeanor of counsel and can determine whether a prejudicial atmosphere is created by such remarks.'"); see also Minor, 914 So. 2d at 423-24 (finding comments were not directed at defense counsel's integrity but at the lack of evidence supporting the defense's theory).  We also note that, while a curative instruction was not given directly after the complained-of argument, the trial court instructed the jury that the lawyers' statements or arguments are not evidence.  (R. 860-61.)  This Court has noted on numerous occasions that "'jurors are presumed to follow, not disregard, the trial court's instructions.'"  DeBlase v. State, 294 So. 3d 154, 252 (Ala. Crim. App. 2018) (citation omitted).  Given these circumstances, we do not find that Orr's due-process rights were violated.  Orr is, thus, due no relief.

### III.   Illegal Sentence

Orr's convictions and his resulting sentences for intentional murder, attempted murder, and attempted first-degree assault are proper.  Orr's conviction for discharging a firearm into an occupied

vehicle is also proper. However, although neither Orr nor the State challenges Orr's 10-year "straight" sentence for discharging a firearm into an occupied vehicle, we must take notice that Orr's 10-year sentence is illegal.

> "It is well settled that '[m]atters concerning unauthorized sentences are jurisdictional.' Hunt v. State, 659 So. 2d 998, 999 (Ala. Crim. App. 1994). Therefore, this Court may take notice of an illegal sentence 'at any time and may do so even ex mero motu.' Moore v. State, 40 So. 3d 750, 753 (Ala. Crim. App. 2009)."

Towns v. State, 293 So. 3d 975, 985 (Ala. Crim. App. 2019).

Discharging a firearm into an occupied vehicle is a Class B felony offense. § 13A-11-61(a) and (b), Ala. Code 1975. A Class B felony is punishable by imprisonment for "not more than 20 years or less than two years." § 13A-5-6(a)(2), Ala. Code 1975. However, the State provided reasonable notice to Orr to invoke the Habitual Felony Offender Act and gave notice of three prior felony convictions. (C. 31-32.) At the sentencing hearing, the State admitted certified copies of Orr's prior felony convictions for the trial court's consideration. (C. 626-40; R. 898-99.) Although the trial court did not expressly find that Orr had three prior felony convictions, the only dispute at the sentencing hearing involving Orr's prior felony convictions was whether the trial court was

23

required to impose a sentence of life imprisonment without the possibility of parole on his Class A felony convictions because of the parties' dispute as to whether one of his three prior out-of-state felony convictions should have been treated as a Class A felony, which would have mandated a sentence of life imprisonment without the possibility of parole on Orr's convictions for murder and attempted murder, pursuant to § 13A-5-9(c)(4), Ala. Code 1975. Orr successfully argued that the trial court was not required to impose a sentence of life imprisonment without the possibility of parole on his Class A felony offenses, but Orr never argued that he had less than three prior felony convictions. It appears clear that Orr was sentenced under the Habitual Felony Offender Act for having three prior Class B or C felony convictions; thus, his Class B felony is punishable "by imprisonment for life or any term of not less than 20 years." § 13A-5-9(c)(2). Because Orr's sentence of 10 years' imprisonment is illegal, we must remand this case to the trial court for it to impose a sentence on Orr that complies with § 13A-5-9(c)(2).

Conclusion

For these reasons, Orr's convictions for intentional murder, attempted murder, and attempted first-degree assault and the resulting

concurrent sentences of life imprisonment, life imprisonment, and 15 years' imprisonment, respectively, are affirmed. Orr's conviction for discharging a firearm into an occupied vehicle is also affirmed. However, this case is remanded to the trial court for that court to resentence Orr in accordance with this opinion for his discharging-a-firearm-into-an-occupied-vehicle conviction. Due return shall be made to this Court within 42 days of the date of this opinion.

AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Minor and Anderson, JJ., concur. Kellum, J., concurs in the result.