Rel: June 27, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

———————————————

### CR-2023-0898

———————————————

### Marvin Bernard McMillian

### v.

### State of Alabama

### Appeal from Mobile Circuit Court
### (CC-21-868 and CC-21-1894)

ANDERSON, Judge.

Marvin Bernard McMillian was convicted in case number CC-21-868 of driving under the influence, a violation of § 32-5A-191, Ala. Code 1975. He was sentenced to one year of imprisonment; however, that sentence was split, and he was ordered to serve 10 months' imprisonment

followed by 2 years of formal probation. The suspension of McMillian's sentence was conditioned upon the payment of $100 to the Department of Forensic Sciences, a $1,000 donation to Mothers Against Drunk Driving, a $50 Crime Victim Assessment, and court costs. In case number CC-21-1894, McMillian pleaded guilty to the unlawful possession of a controlled substance, a violation of § 13A-12-212, Ala. Code 1975, and was sentenced to five years' imprisonment. This appeal followed.

### Facts and Procedural History

#### A. Case Number CC-21-868

In March 2021, McMillian was indicted on one count of first-degree assault, see §13A-6-20(a)(5), Ala. Code 1975, one count of driving under the influence, see § 32-5A-191, Ala. Code 1975, and one count of disorderly conduct, see § 13A-11-7, Ala. Code 1975.

The following evidence was presented at trial:

David Darnell testified that, on August 15, 2020, he was working as a security guard at a venue hall called "The Steeple," located on the corner of Joachim Street and St. Francis Street in Mobile. At 6:49 p.m. that evening, Darnell was standing outside The Steeple near the intersection of Joachim Street and St. Francis Street. Darnell observed a

2

Ford Explorer drive into the intersection and then witnessed a motorcycle hit the Explorer from the side. Darnell testified that the Explorer spun and proceeded down St. Francis Street before stopping. According to Darnell, the motorcycle was laying in the street, wheels spinning, and the motorcycle driver was on the ground. Darnell testified that "it was a gruesome scene," because the motorcycle driver's jaw was "just hanging" and there was "a lot of blood." (R. 95.) Darnell yelled for someone to call 911. Darnell then went to check on the driver of the Explorer, later identified as McMillian. McMillian informed Darnell that he was not injured.

Sharon Summerlin, a wedding coordinator who was working an event at The Steeple on the night of the incident, testified that, at approximately 6:45 p.m., she was outside waiting on guests to arrive. Summerlin testified that she turned toward the intersection of Joachim Street and St. Francis Street and that she could "hear something coming" and then heard "the impact." (R. 100.) Summerlin testified that she saw the motorcycle spinning and observed the motorcycle driver on the ground. Summerlin yelled for the motorcycle driver to "stay put," and she stayed with him as much as she could while also tending to her

3

responsibilities inside the venue. (Id.) Summerlin claimed that the motorcycle driver was "in shock," that his jaw was displaced, and that "his lips were almost coming off." (R. 101.) Summerlin described the aftermath of the incident by stating there was "so much blood" coming from the motorcycle driver's injuries and that she had "never seen anybody with that type of facial [damage]" and still be able to understand what was going on. (Id.)

Corporal Paul Lee with the Mobile Police Department (the "MPD") testified that, at approximately 6:45 p.m. on the night of the incident, he responded to a dispatch call regarding a wreck at the intersection of Joachim Street and St. Francis Street. When Corporal Lee arrived, he observed a damaged motorcycle laying on its side, as well as a male with "obvious injuries to his face" sitting upright in the intersection. (R. 85.) A copy of Corporal Lee's body-camera video footage was entered into evidence and played for the jury. Corporal Lee testified that he stayed with the motorcycle driver until personnel from the fire department arrived; however, he noted that the motorcycle driver had, what Corporal Lee described as an "open fracture" of the lower jaw, abrasions on his body, "injuries to his arms," and "a couple tears on his pants." (R. 89.)

4

Corporal James Mistrot, an officer with the MPD's Major Crimes Unit, also responded to the dispatch call about the incident. When Corporal Mistrot arrived, he observed the Ford Explorer at a 45-degree angle crossing both lanes of St. Francis Street. He also saw the motorcycle driver sitting in the middle of the intersection beside the motorcycle, which was lying on its side. Corporal Mistrot checked on the motorcycle driver and notified dispatch that the motorcycle driver had suffered "very severe" injuries. (R. 106.) Corporal Mistrot had another officer assist the paramedics who were providing treatment to the motorcycle driver.

Corporal Mistrot then went to the Explorer and began speaking with McMillian. According to Corporal Mistrot, McMillian's eyes were "bloodshot and glassy," his speech was slurred, and the "moderate smell of an alcoholic beverage was coming off of his breath and person." (R. 108.) Corporal Mistrot testified that McMillian was able to walk unobstructed but that his steps were "somewhat staggered." (R. 108.) Corporal Mistrot administered two field-sobriety tests, which McMillian failed to perform successfully. A copy of Corporal Mistrot's body-camera footage showing the administration of the field-sobriety tests, and

5

McMillian's performance on those tests, was admitted into evidence and played for the jury. Corporal Mistrot testified that, based off his "initial observations and speaking with [McMillian] and observations during the Standardized Field Sobriety Tests, [Corporal Mistrot] felt that [McMillian] was impaired beyond the ability to safely operate a motor vehicle on an Alabama roadway." (R. 115.) Corporal Mistrot then placed McMillian under arrest.

Corporal Mistrot transported McMillian to the MPD station to run the "Draeger chemical breath test on him"; however, McMillian became "belligerent and argumentative" and "refused to give a sample of his breath." (R. 115.) Corporal Mistrot testified that he subsequently obtained a search warrant to acquire samples of McMillian's blood to determine the alcohol content of his blood. McMillian was taken to University Hospital and placed in a triage room. There, he "became very belligerent and boisterous, was cussing and yelling and making several threats to officers and hospital staff." (R. 116.) Corporal Mistrot stated that McMillian did not comply with the blood draw at the hospital.

According to Corporal Mistrot, McMillian then had to be placed in a trauma bay, where two officers and several nurses and doctors

6

attempted to secure McMillian to the bed. While attempting to secure McMillian to the bed, Corporal Mistrot testified, McMillian "became extremely combative and even more irate, threatening all of our lives and safety." (R. 121.) Corporal Mistrot claimed that the hospital then deemed it a "necessary safety precaution to allow us to obtain his blood lawfully without any intrusion or any risk of injury to himself or to us" to sedate McMillian using Ketamine. After the Ketamine took effect, the hospital staff were able to obtain two separate blood draws from McMillian at approximately 10:00 p.m. and 11:00 p.m., respectively. Corporal Mistrot explained that he was present and involved in the blood draws, that he secured the vials and sealed them with the evidence seals, and that he remained in possession of the blood draws until he deposited them with the records unit at the MPD station. After the Ketamine wore off, McMillian was transported to the Mobile County Metro Jail.

Corporal Mistrot claimed that, based on his training and experience, he concluded that McMillian, who was traveling southbound on Joachim Street, failed to yield the right-of-way by stopping at a stop sign, causing the motorcycle driver, who was traveling westbound on St.

7

Francis Street on his motorcycle, to strike McMillian's Explorer. The motorcycle driver was thrown into the air on impact.

The motorcycle driver testified about the incident and detailed the severity of his injuries and recovery.

Kristen Tidwell, the toxicology section chief for the Alabama Department of Forensic Sciences (the "DFS"), testified as a blood-toxicology expert. She conducted a toxicological analysis on McMillian's blood, which revealed that .092 grams per 100 milliliters of ethanol, or drinking alcohol, were present in the blood that was drawn from McMillian at approximately 11:30 p.m. on the night of the incident. Additionally, the analysis revealed the presence of "Delta-9-tetrahydrocannabinol," the primary psychoactive ingredient in marijuana, and "9-carboxy-11-Nor-Delta-9-THC," the metabolite of marijuana, in McMillian's blood. Using retrograde extrapolation, a calculation to estimate what a person's blood-alcohol concentration would have been at an earlier point in time than when the person's blood was drawn, Tidwell estimated that McMillian's blood-alcohol concentration would have been "between 0.137 and 0.205" at the time of the incident. (R. 159.)

McMillian testified in his own defense. He claimed that he stopped at the stop sign on Joachim Street and that, when he did not see traffic on St. Francis Street, he proceeded into the intersection. According to McMillian, once he got into the intersection, he saw the motorcycle speeding toward his vehicle. McMillian testified that he tried to speed away but that the motorcycle was going "so fast" that it hit his Explorer, hard, before he could clear the intersection. (R. 185.) McMillian claimed that he got out of his Explorer and went to check on the motorcycle driver immediately following the incident.

At the conclusion of the trial, the jury found McMillian guilty of the charge of driving under the influence and acquitted McMillian on the charges of first-degree assault and disorderly conduct. At the sentencing hearing on September 26, 2023, the Mobile Circuit Court sentenced McMillian to one year of imprisonment. That sentence was split, and he was ordered to serve 10 months' imprisonment followed by two years of formal probation.

## B. Case Number CC-21-1894

In June 2021, McMillian was indicted on one count of unlawful possession of a controlled substance, a violation of § 13A-12-212, Ala.

Code 1975, and one count of unlawful possession of marijuana in the second degree, a violation of § 13A-12-214, Ala. Code 1975. On September 26, 2023, during the same proceedings as the circuit court's sentencing in case number CC-21-868, the circuit court accepted McMillian's guilty plea to one count of unlawful possession of a controlled substance. The State represented that the evidence would show that "on or about February 1, 2020, an officer pulled over [McMillian]. During the … lawful traffic stop, [McMillian] was found to be in possession of cocaine." (R. 250.) The circuit court adjudged McMillian guilty and, per the plea agreement, sentenced him to five years' imprisonment. His sentence was ordered to run concurrently with his sentence in case number CC-21-868. As part of the plea agreement, the State moved to nolle pros Count II in the indictment.

On October 26, 2023, McMillian filed a motion to alter, amend, or vacate his sentence in each case, claiming that "the sentence[s] imposed in these cases are contrary to the sentencing guidelines" and that "the sentence[s] imposed [are] in excess of the statutory provisions of the law." (C. 78.) The circuit court denied his motion to vacate his sentences on October 30, 2023.

<u>Discussion</u>

On appeal, McMillian argues 1) that, in case number CC-21-868, he is entitled to a remand for an evidentiary hearing because, he says, the circuit court improperly denied his oral motion to suppress the evidence pertaining to the blood draws taken in his case without holding a hearing and 2) that in case number CC-21-1894, his sentence was illegal and his guilty plea was involuntary because he was not properly informed of the minimum possible sentence he could receive for unlawful possession of a controlled substance or the appropriate dispositional outcome of his sentence under the presumptive sentencing guidelines.

I.

McMillian argues that, in case CC-21-868, he is entitled to a remand for an evidentiary hearing because, he says, the trial court improperly denied his oral motion to suppress the evidence pertaining to the blood draws without holding a hearing, as required by Rule 104(c), Ala. R. Evid. The State argues that, because McMillian failed to adequately specify any legal grounds in support of his oral motion to suppress before the circuit court, the circuit court's denial of the motion without a hearing was proper. The State also contends that, in the

11

alternative, any error in the circuit court's refusal to hold an evidentiary hearing was harmless.

McMillian did not file a written, pretrial motion to suppress. Instead, during Corporal Mistrot's testimony at trial -- regarding McMillian's lack of cooperation at the hospital -- defense counsel requested a sidebar conference. The circuit court subsequently removed the jury from the courtroom, and, outside the presence of the jury, defense counsel vaguely asserted -- at McMillian's apparent insistence -- that the seizure of his blood was "unreasonable":

> "[Defense counsel]:  Judge, he still wants me to assert that it was not reasonable and he thought it was an improper seizure of his blood for purposes of this prosecution, so --
>
> "THE COURT:  Okay. On what grounds? Motion to suppress on what grounds? You said illegal. That's fairly broad.
>
> "[Defense counsel]:  Yes ma'am. Unreasonable.
>
> "THE COURT:  Unreasonable. Well, I think I need you to be a little more elaborate.
>
> "[Defense counsel]:  Judge, the whole nature of this subsequent charge -- and, I think, this is now we're getting into the disorderly conduct charge -- is -- and I don't know if they're planning on playing that video or what was said in that, but it

12

> was his response to them trying to draw blood that got him so irate.
>
> "THE COURT: Okay, so you want me to have a hearing on a motion to suppress a blood draw because it was unreasonable?
>
> "[Defense counsel]: That's right.
>
> "[McMillian]: Uh-huh.
>
> "[Defense counsel]: That's what he wants.
>
> "THE COURT: Well, that request is denied. You've made no legal basis on which I can conduct a motion to suppress, so that motion is denied."

(R. 118-19.) As reflected by this exchange, defense counsel offered nothing in response to the circuit court's request for a legal or factual ground more precise than a vague assertion of unreasonableness. "A motion to suppress should be specific with reference to the grounds upon which the movant relies." Kaercher v. State, 554 So. 2d 1143, 1147 (Ala. Crim. App. 1989). Nor does McMillian shed additional light on this issue in his brief; instead, he merely repeats the bare claim of unreasonableness and argues that it is "impossible" to know what might have been offered to support the claim. (McMillian's brief at 24.)

Immediately after the circuit court's ruling, trial proceedings resumed and the video recording from Corporal Mistrot's body camera depicting the events at the hospital, including McMillian's uncooperative behavior before his blood was drawn, was played for the jury and entered into evidence. Later in the proceedings, Tidwell, a blood-toxicology expert with the DFS, testified about the toxicological analysis performed on McMillian's blood, which revealed that .092 grams per 100 milliliters of ethanol, or drinking alcohol, were present in McMillian's blood when it was drawn at approximately 11:30 p.m. on the night of the incident. A copy of the toxicological-analysis report was also entered into evidence. McMillian did not object to Tidwell's testimony regarding the toxicology analysis, nor did he object to the admission of the toxicological-analysis report. Nor did McMillian ever state any specific grounds for excluding or suppressing the blood-draw evidence. On appeal, McMillian argues that "[n]othing more was required" than to state that the blood draw was "unreasonable." (McMillian's brief at 24.) We disagree.

Initially, we must determine whether McMillian has preserved this issue for our review. As we have previously noted, the better practice when challenging evidence is to bring a suppression motion before trial;

14

however, a defendant may challenge the admissibility of evidence when it is offered at trial. Lewis v. State, 27 So. 3d 600, 602 (Ala. Crim. App. 2008). Had McMillian filed a pretrial motion to suppress, as allowed by Rules 3.13 and 15.6, Ala. R. Evid., he could have obtained a ruling that would have clearly preserved the issue because the denial of such a motion is a final ruling on the admissibility of the evidence. Bacot v. State, 597 So. 2d 754, 756 (Ala. Crim. App. 1992) (citing Newsome v. State, 570 So. 2d 703 (Ala. Crim. App. 1989)). Similarly, had McMillian made a timely objection when the evidence was offered, he would have preserved the issue for our review. Lewis, 27 So. 3d at 602.

But McMillian did neither of those things. Instead, during Corporal Mistrot's testimony about the circumstances of the blood draws, McMillian caused a disturbance in the trial. His trial counsel requested permission to approach the bench and obtained time to speak with his client outside the presence of the jury. (R. 117.) Afterwards, also outside the presence of the jury, defense counsel conveyed McMillian's assertion that the blood draws were unreasonable. However, to "preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof."

15

Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003); see also McKinney v. State, 654 So. 2d 95, 99 (Ala. Crim. App. 1995). McMillian's objection to the blood-draw evidence, such as it was, was not timely because it was neither raised in a pretrial motion nor as an objection when the allegedly illegal evidence was offered. "Objections to the admission of evidence must be made when the evidence is offered, along with specific grounds to allow the trial court to rule." Craig v. State, 616 So. 2d 364, 366 (Ala. Crim. App. 1992); see also Nation v. State, 627 So. 2d 1156, 1158-59 (Ala. Crim. App. 1993). Consequently, McMillian failed to preserve this issue for our review.

Even if McMillian had preserved this issue, however, he would be due no relief because his motion failed to raise any specific legal or factual challenge to the State's method of acquiring the evidence. "A motion to exclude must state proper specific grounds or it may be properly overruled by the trial court." Yarbrough v. State, 405 So. 2d 721, 724 (Ala. Crim. App. 1981). Indeed, McMillian has never offered any specific grounds to support his motion. As noted previously, the State seized McMillian by means of an arrest, and McMillian's body was searched, and his blood was drawn pursuant to a search warrant. See Brown v.

16

State, 11 So. 3d 866, 899 (Ala. Crim. App. 2007) (noting that a blood seizure pursuant to a search warrant is "presumed valid").

Finally, for two important reasons, the circumstances of this case are distinguishable from those of previous cases in which we have found error in a trial court's failure to hold a suppression hearing outside the presence of a jury. First, in <u>Lewis</u>, the defendant properly preserved the issue by raising a specific objection to the admission of his confession at the time that it was offered. <u>Lewis</u>, 27 So. 3d at 602. Similarly, in <u>Ex parte Jackson</u>, 836 So. 2d 973 (2001), the defendant filed a pretrial motion[1] specifically arguing extensive grounds for suppression of his confession, and he objected when the statement was offered "specifically referencing the pretrial motion to dismiss." <u>Ex parte Jackson</u>, 835 So. 2d at 974. Likewise, in <u>Lane v. State</u>, 169 So. 3d 1076 (Ala. Crim. App. 2013), vacated, <u>Lane v. Alabama</u>, 577 U.S. 802 (2015), the defendant made a pretrial motion to suppress his confession, and no hearing was held before or during trial. 169 So. 3d 1108-09.

---

[1]Also, unlike in the present case, Jackson's pretrial motion preserved the issue for review. <u>Ex parte Jackson</u>, 835 So. 2d at 974.

17

Second, all three of those previous cases involved motions to suppress confessions and relied heavily on <u>Jackson v. Denno</u>, 378 U.S. 368, 385 (1964), a case concerned with "involuntary confessions," not unreasonable searches. There are important legal differences between challenging a confession and challenging an item of evidence seized pursuant to a search warrant. Indeed, it is noteworthy that, under Alabama law, an extrajudicial confession is <u>presumed</u> to be involuntary but that no such presumption applies to searches conducted pursuant to a search warrant. <u>Compare</u> <u>Ex parte Matthews</u>, 601 So. 2d 52, 53 (Ala. 1992) (noting that "extrajudicial confessions are presumed to be involuntary and, therefore, are prima facie inadmissible"), <u>with</u> <u>Brown</u>, <u>supra</u> (holding that a seizure of blood drawn pursuant to a search warrant was presumed valid); <u>cf.</u> <u>State v. Taylor</u>, 676 So. 2d 951, 952 (Ala. Crim. App. 1995) (quoting <u>German v. State</u>, 492 So.2d 622 (Ala. Crim. App. 1985)) ("The burden was on the [defendant] to establish that his own Fourth Amendment rights were violated by the challenged search and seizure."). Thus, while <u>Jackson v. Denno</u>, <u>Ex parte Jackson</u>, and <u>Lewis</u> all stand for the proposition that a hearing outside the presence of the jury is required on a bona fide motion to suppress a

18

confession,[2] they <u>do not</u> stand for the proposition that such a hearing is <u>required</u> on a conclusory motion to suppress or exclude physical evidence such as was made in the present case. Nor does Rule 104(c), Ala. R. Evid., <u>require</u> an extensive hearing on <u>every</u> motion to exclude evidence.

We note, however, that when such a hearing is held, it is governed by Rule 104(c), which provides, in pertinent part, that, "[i]n criminal cases, hearings on the admissibility of confessions or evidence alleged to have been obtained unlawfully <u>shall be</u> conducted out of the hearing and presence of the jury." (Emphasis added.) In the present case, McMillian was offered the opportunity to make an argument outside the presence of the jury. The circuit court did not overrule his objection out of hand; rather, McMillian was provided an opportunity to "elaborate" on his bare motion. In response, McMillian's counsel could offer nothing more than his client's subjective opinion that the blood draws, conducted pursuant to a search warrant, were "unreasonable." For these reasons, based on

---

[2]Not every vague challenge to a confession requires a hearing. As we recently held in <u>Ketchum v. State</u>, [Ms. CR-2023-0611, May 3, 2024] __ So. 3d __, __ (Ala. Crim. App. 2024), defense counsel's argument regarding the voluntariness of a confession "[p]robably … should be taken up outside the presence of the jury" was not sufficient to require a hearing.

19

the record before us, we cannot say that the circuit court erred by not holding a more extensive hearing outside the presence of the jury.

## II.

Next, McMillian alleges that, in case number CC-21-1984, his sentence of five years' imprisonment for his guilty-plea conviction of unlawful possession of a controlled substance was illegal because, he says, the sentence failed to comply with the presumptive sentencing guidelines or with "applicable law." (McMillian's brief at 10.) Thus, he argues, his sentence must be reversed and this matter remanded for resentencing and an opportunity to withdraw his guilty plea. In its brief, the State concedes that McMillian's sentence is illegal. (State's brief at 15.)

During McMillian's plea colloquy, the circuit court acknowledged that McMillian had one prior felony conviction. Before accepting McMillian's plea of guilty to the charge of unlawful possession of a controlled substance, the circuit court stated:

> "You're entering a plea of guilty today to a Class D felony, which carries up to, in your case, a year and a day up to five years in the State penitentiary and a fine up to $7,500. Is that you're understanding?"

(R. 249.) McMillian responded, "Yes, ma'am." Id. McMillian then pleaded guilty to unlawful possession of a controlled substance, which is a Class D felony. See § 13A-12-212(b), Ala. Code 1975. The record indicates that, before the sentencing hearing, a "Drug (Class D) Prison In/Out Worksheet" and a "Drug (Class D) Sentence Length Worksheet" were completed. See (C. 63-64.) McMillian received a score of 9 on his Prison In/Out Worksheet, which fell into the "prison" range for sentencing. (C. 63.) McMillian received a total score of 107 on the Sentence Length Worksheet, giving a possible sentence range of 15 to 97 months for a straight sentence, or 8 to 24 months for a split sentence. (C. 64.) The circuit court ultimately sentenced McMillian pursuant to the plea agreement for a term of five years' imprisonment.

The possession of a controlled substance is an offense that is covered by the Presumptive Sentencing Standards. Presumptive and Voluntary Sentencing Standards Manual, at 23 (2019) (the "manual"). The Presumptive Sentencing Standards provide, in pertinent part:

> "When choosing a sentence from the recommended sentence range, the sentence chosen must not be less than the statutory sentences specified in [§ 13A-5-6(a)(1)-(4), Ala. Code 1975], provided, however, that the sentence must in some cases, and could in others, be 'split' pursuant to [§ 15-18-8, Ala. Code

21

1975], as specified in the instructions relating to the imposition of sentence.

"....

"For a Class D felony, the minimum sentence imposed must be at least 12 months and 1 day."

The Manual, at 28. Regarding Class D felonies, the Presumptive Sentencing Standards also provide, in pertinent part:

"If the most serious offense at a sentencing event is a Class D felony and the offender is not sentenced to probation, drug court, or a pretrial diversion program, the offender must be sentenced to a 'split sentence' pursuant to the requirements specified in [Section §15-18-8(b), Ala. Code 1975,] and the presumptive sentencing ranges.

The Manual, at 29 (emphasis added).

This Court addressed a similar situation in Laakkonen v. State, 293 So. 3d 439 (Ala. Crim. App. 2019), wherein Laakkonen, who has two prior felony convictions, pleaded guilty to unlawful possession of a controlled substance, and was sentenced to 24 months in the county jail. Laakkonen claimed that his sentence was illegal because, he said, the trial court had failed to properly inform him of the possible sentence range that could be imposed for his conviction and, he said, the trial court had failed to properly split his sentence under § 15-18-8, Ala. Code 1975. Id. In Laakkonen, this Court recognized that, "[i]n addition to conforming to

the disposition recommendation of the Prison In/Out Worksheet and the sentence-length range from the Sentence Length Worksheet, a sentence for a Class D felony must also comport with the requirements of § 15-18-8, Ala. Code 1975, under the circumstances of this case." 293 So. 3d at 443 (citing The Manual at 25, 27).

In this case, the underlying offense occurred on February 1, 2020. Section 13A-5-6(a)(4), Ala. Code 1975, states that the sentence for a Class D felony shall be a term of imprisonment of "not more than five years or less than one year and one day." Additionally, at the time of the underlying offense, § 15-18-8(b) provided, in pertinent part:

> "Unless a defendant is sentenced to probation, drug court, or a pretrial diversion program, when a defendant is convicted of an offense that constitutes a Class C or D felony offense and receives a sentence of not more than 15 years, the judge presiding over the case shall order that the convicted defendant be confined in a prison, jail-type institution, treatment institution, or community corrections program for a Class C felony offense or in a consenting community corrections program for a Class D felony offense, except as provided in subsection (e), for a period not exceeding two years in cases where the imposed sentence is not more than 15 years, and that the execution of the remainder of the sentence be suspended notwithstanding any provision of the law to the contrary and that the defendant be placed on probation for a period not exceeding three years and upon such terms as the court deems best."

(Emphasis added.) Additionally, "[a] sentence that does not conform to the Presumptive [Sentencing] Standards … is a departure sentence and may be entered <u>only</u> upon a finding of aggravating and/or mitigating factors that justify a departure from the presumptive sentence recommendations." <u>The Manual</u> at 29 (emphasis added).

Here, there is nothing in the record suggesting that the State presented or alleged the existence of an aggravating factor; nor is there a finding by the circuit court or any evidence of an agreement by the parties pertaining to the existence of an aggravating factor. Thus, the circuit court should have sentenced McMillian under the Presumptive Sentencing Standards <u>and</u> pursuant to the requirements of § 15-18-8. <u>See</u> <u>Laakkonen</u>, 293 So. 3d at 443.

Under the Presumptive Sentencing Standards, the term of imprisonment for McMillian's Class D felony offense could not have been less than one year and one day, which was the smallest sentence he could receive for a Class D felony under § 13A-5-6(a)(4). McMillian's five-year sentence of imprisonment was within the range of punishment under § 13A-5-6(a)(4). However, in compliance with the Presumptive Sentencing Standards, McMillian's sentence must also comport with the

requirements of § 15-18-8, which required that he be sentenced to a community-corrections program for a period not exceeding two years, that the execution of the remainder of his sentence be suspended, and that he be placed on probation for a period not exceeding three years. Additionally, under the relevant worksheets, McMillian's possible sentence range was 8 to 24 months for a split sentence. (C. 64.) Therefore, McMillian's straight sentence of five years' imprisonment was illegal.

Despite the fact that the State and McMillian agreed on the sentence in question, "'a [circuit] court cannot accept a plea agreement that calls for an illegal sentence.'" Wells v. State, 381 So. 3d 508, 511 (Ala. Crim. App. 2022) (quoting Calloway v. State, 860 So. 2d 900, 906 (Ala. Crim. App. 2002)). Therefore, we must reverse McMillian's sentence for his unlawful possession of a controlled substance conviction and remand the case for the circuit court to resentence McMillian for that conviction. However, as previously noted, McMillian's five-year underlying sentence was within the appropriate range of punishment under § 13A-5-6(a)(4), and, thus, the circuit court cannot change it. Reynolds v. State, 334 So. 3d 262, 277 (Ala. Crim. App. 2020) (citing Moore v. State, 871 So. 2d 106, 110 (Ala. Crim. App. 2003)).

Further, McMillian's illegal sentence was part of a plea agreement, and, thus, "'[r]esentencing [will] be a rejection of the plea agreement.'" Wells, 381 So. 3d at 512 (quoting Pate v. State, 884 So. 2d 1, 3 (Ala. Crim. App. 2003)). "When an illegal sentence is imposed in accordance with a plea agreement[,] the [defendant] is entitled to withdraw his plea." Williams v. State, 203 So. 3d 888, 894 (Ala. Crim. App. 2015). Therefore, the circuit court must allow McMillian to withdraw his guilty plea to the unlawful possession of a controlled substance conviction, if he timely moves to withdraw his plea after he is resentenced. Wells, 381 So. 3d at 512; Williams, 203 So. 3d at 894. We note, however, that McMillian is not required to withdraw his guilty plea; he may elect not to do so. See Wells, 381 So. 3d at 512. Consequently, we reverse McMillian's sentence in case number CC-21-1984, and we remand that case to the circuit court for it to resentence McMillian in accordance with this decision.

### Conclusion

For the foregoing reasons, in case no. CC-21-868, we affirm McMillian's conviction and sentence.

In case no. CC-21-1894, we reverse and remand as to McMillian's illegal sentence.

AFFIRMED AS TO THE CONVICTION AND SENTENCE IN CASE NO. CC-21-868; REVERSED AND REMANDED AS TO THE SENTENCE IN CASE NO. CC-21-1894.

Windom, P.J., and Kellum and Cole, JJ., concur. Minor, J., concurs in the result.